**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| JENNIFER MITCHELL, individually and as the Personal Representative of the Estate of I.J.E., <br><br> Plaintiff, <br><br> v. <br> META PLATFORMS, INC., formerly known as FACEBOOK, INC.; and SNAP, INC. <br><br> Defendants. | CIVIL ACTION NO. 8:22 cv 1759 KKM-AEP <br><br> COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP, AND FOR VIOLATIONS OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLA. STAT. ANN. § 501.204, *ET SEQ.* <br><br><br><br><br> JURY TRIAL DEMAND |

"In these digital public spaces, which are privately owned and tend to be run for profit, there can be tension between what's best for the technology company and what's best for the individual user or for society. Business models are often built around maximizing user engagement as opposed to safeguarding users' health and ensuring that users engage with one another in safe and healthy ways. . . ."

*Protecting Youth Mental Health,* The U.S. Surgeon General's Advisory (December 7, 2021)

## COMPLAINT

Plaintiff Jennifer Mitchell, individually and as the Personal Representative of the Estate of I.J.E., brings this action against Meta Platforms, Inc., formerly known as Facebook, Inc. ("Meta"), doing business as Instagram ("Instagram") and Snap, Inc., doing business as Snapchat ("Snapchat") and alleges as follows:



1

## I.   INTRODUCTION

### A.   Plaintiff's Claims

1.     This product liability action seeks to hold Defendants' products responsible for causing and contributing to burgeoning mental health crisis perpetrated upon the children and teenagers of the United States by Defendants and, specifically for injuries they caused I.J.E. and his resulting wrongful death.

2.     I.J.E. suffered injuries proximately caused by Defendants' unreasonably dangerous and defective social media products, which injuries include but are not limited to addiction, anxiety, depression, and ultimately death. On August 14, 2019, I.J.E. died after filming and posting three videos of himself on Snapchat playing a dangerous game known as Russian Roulette. This was a game I.J.E. learned about from material Instagram and Snapchat directed to him via their recommendation systems, including recommendations to harmful content, but also, recommendations to harmful users who would ultimately encourage I.J.E. in dangerous and self-harming behaviors.

3.     The claims in this action are about dangerous social media products and, more specifically, grossly dangerous and unnecessary product features – product features purposefully designed to addict and exploit children and teens and that have, for years, been causing incredible harm to young users, which harms are known to these Defendants.

4.     Defendants' social media products likewise caused foreseeable harms to Plaintiff Jennifer Mitchell. Jennifer Mitchell did not consent to Defendants distributing or otherwise providing her child with access to harmful social media products and was emotionally and financially harmed by Defendants' addictive design and distribution and provision of harmful social media products to her minor child.

5.     Each of Defendants' products contains unique product features which are intended to and do encourage addiction, and unlawful content and use of said products, to the detriment of Defendants' minor users.

6.     These social media products create a "perfect storm" of addiction, social

2

comparison, and/or exposure to incredibly harmful content and harmful product features. Defendants make affirmative recommendations to young users, designed to increase user engagement and revenue, but often at the expense of exposing those young users to bullying, exploitation, abuse, and other harms. Defendants likewise program and operate their algorithms and social media products in a manner that prioritizes engagement and profits over user safety. This includes, but is not limited to, design and distribution of inherently dangerous products that are meant to appeal to minors, identifying and directing minors to harmful and violent content they otherwise would not see, and operating algorithms and other technologies in a manner that promotes and amplifies harmful content to minors.

7.      Plaintiff suffered several emotional, physical, and financial harms as a result—all of which are a symptom of the current health crisis among American youth and, by natural and foreseeable extension, American families, caused by certain, harmful social media products such as the ones at issue in this case.

**B.      Defendants Know or Should Know of the Harm Their Products Cause**

8.      In late 2021, a Facebook whistleblower disclosed thousands of internal Meta documents to the United States Securities Exchange Commission (the "SEC") and Congress. The Facebook Papers prove known dangerous designs and design defects as well as operational decisions and calculations, and a causal relationship between use of Defendants' various social media products in their current form and resulting addiction, anxiety, depression, eating disorders, exploitation and grooming, and what Meta internally refers to as "SSI" (Suicide and Self Injury). While the Facebook Papers originate from Meta, they prove dangerous designs and design defects as well as other dangers caused by the social media products of all Defendants.  Examples of the Facebook papers include and can be found at the following locations, to name only some examples:

9.      The Wall Street Journal and Digital Wellbeing published several of the

3

Facebook Papers in November 2021,[1] including but not limited to,

      a.  Social Comparison: Topics, celebrities, Like counts, selfies [Jan 2021 internal document reporting findings from a 9-country user survey (n=100,000) in Australia, Brazil, France, Germany, Great Britain, India, Japan, Korea, USA].

      b.  Appearance-based Social Comparison on Instagram [Feb 2021 internal document reporting finding from a 10-country user survey (n=50,590) across Australia, Brazil, France, Germany, Great Britain, India, Japan, Korea, Mexico, USA].

      c.  Mental Health Findings: Deep dive into the reach, intensity, Instagram impact, self-reported usage and support of mental health issues [2019 internal document reporting findings from a 6-country user survey (n=22,410) across Brazil, India, Indonesia, Japan, Turkey, USA].

      d.  Teen Girls Body Image and Social Comparison on Instagram – An Exploratory Study in the US [2020 internal document reporting findings from a one-country (US) qualitative research study (n = 15 for focus groups) with young Instagram users (aged 13-21, supplemented by online diaries (n = 10) and video interviews (n = 7)].

      e.  Teen Mental Health Deep Dive [2019 internal document reporting findings from a 2-country (UK and US) qualitative research study (n = 40 in-person interviews, with follow-up video calls (n = 8) with young Instagram users (aged 13-17), supplemented by online survey (n = 2,503)].

      f.  Teens and Young Adults on Instagram and Facebook [2021 internal document reporting findings from a five-country study (Australia, France, Great Britain, Japan, USA) with user data].,

    10.    Gizmodo has been publishing the Facebook Papers, several at a time, also starting in November 2021,[2] including but not limited to,

      a.  Why We Build Feeds

      b.  Is Ranking Good

      c.  Big Levers Ranking Experiment

      d.  [LAUNCH] Civic Ranking: Engagement-Based Worth Your Time

      e.  MSI Metric Note Series

      f.  The Meaningful Social Interactions Metric Revisited: Part 2

      g.  The Meaningful Social Interactions Metric Revisited: Part 4

---

[1] https://digitalwellbeing.org/the-facebook-files-on-instagram-harms-all-leaked-slides-on-a-single-page/
[2] https://gizmodo.com/facebook-papers-how-to-read-1848702919

h.   The Meaningful Social Interactions Metric Revisited: Part 5

i.   Meaningful Social Interactions Useful Links

j.   MSI Documentation

k.   Evaluating MSI Metric Changes with a Comment-Level Survey

l.   Surveying The 2018 Relevance Ranking Holdout

m.  Overview of MSI + Pages and Survey Research

n.   Is Multi-Group Picker "Spammy?"

o.   Filtering Out Engagement-Bait, Bullying, and Excessive Comments From MSI Deltoid Metric

p.   [LAUNCH] Using p(anger) to Reduce the Impact Angry Reactions Have on Ranking Levers

q.   Planned MSI Metric Changes in 2020

r.   MSI Metric Changes for 2020 H1

s.   Should We Reduce the MSI Weight of Sticker Comments?

t.   Max Reshare Depth Experiment

u.   "Understand This Post's Ranking" —How I Miss Thee!

v.   Facebook and Responsibility

w.  The Surprising Consequences to Sessions and MSI Caused by Turning Off Video Autoplay on News Feed

x.   One-Go Summary Post for Recent Goaling and Goal Metric Changes for News Feed

y.   News Feed UXR Quarterly Insights Roundup

z.   What Happens If We Delete Ranked Feed?

aa. News Feed Research: Looking Back on H2 2020

bb. Content from "Political" Pages in In-Feed Recommendations

cc. Political Content in In-Feed Recommendations (IFR)

dd. In-Feed Recommendations HPM —April 15 2021

These documents are all incorporated by reference into this Complaint and the sole reason they are not attached is length and file size. However, the contents of these documents and other Facebook Papers are material to Plaintiffs' claims.

11.     On information and belief, Defendants Meta and Snap both have some degree of knowledge about the harms their products cause users, particularly teen, child, and other vulnerable user populations, and both continue to operate those products in a harmful and dangerous manner anyway and in the interest of competing with one another and increasing their already astronomical profits. Meta is simply the one whose documents have been disclosed; even then, only a small fraction of relevant documents were disclosed. Plaintiffs anticipate literal truckloads of additional evidence that will support these claims and show precisely what these social media companies have done in the name of corporate greed.

12.     Defendants Meta and Snap both have actual knowledge that children under the age of 13 are using their social media products; that their social media products are highly addictive and harmful to a significant population of all users, but especially teens and children; that certain design features that serve no functional, informational, societal, or educational purpose (for example, "likes" and "streaks") are causing harm to users, but especially teens and children; and that recommendation and recommendation-driven product features are dangerous and harmful by design and as designed. Defendants knew about these harms, could have made their products safer at minimal time and expense, and opted to stay the course instead.

13.     Despite knowledge of the dangerous and harmful characteristics of their products, Defendants have made and continue to make calculated cost-benefit business decisions and are consistently prioritizing their already astronomical profits over human life.

**C.     The Social Media Epidemic Among Children**

14.     On December 7, 2021, the United States Surgeon General issued an advisory cataloging a dramatic increase in teen mental health crises including suicides, attempted suicides, eating disorders, anxiety, depression, self-harm, and inpatient admissions. Between

2007 and 2018, for example, suicide rates among youth ages 12 to 16 in the U.S. increased a staggering 146 percent. Several cities across the United States have been experiencing teen suicide rates in the range of 1 every year or other year, which is an absolute crisis for our country—the death by suicide of a child is something that should be an exception and not a rule. The incidence of serious depression and dissatisfaction with life in this age group has likewise increased dramatically, and there is no question that these harms relate in no small part to companies like Defendants.

15.     The most significant and far-reaching change to the lives of young people in the last ten years has been the widespread adoption of social media platforms and prominently, for purposes of this lawsuit,

      a.  The Instagram product which launched in 2010 and was acquired by Facebook (now Meta) in 2012, and which is designed and distributed by Meta.

      b.  The Snapchat product which launched in 2011, and which is designed and distributed by Snap, Inc.

16.     By 2014, 80 percent of high-school students said they used social media daily, and 24 percent said that they were online "almost constantly." Moreover, there are an estimated 24.5 million teen internet users in the U.S. alone. What this means for each of these defendants is more than 15 million U.S. teens (aged 13 to 17) using their social media product on a regular basis.

17.     Teens make up a significant percentage of all social media users and, in the United States, they also represent Defendants' only significant opportunity for growth due to saturation of the adult market. Defendants see them as a gateway for other potential users, that is, they use U.S. teens to recruit parents and adult relatives as well as younger siblings – including pre-teen siblings Defendants are not permitted provide accounts to but to whom Defendants do provide accounts, by simply refusing to verify age and identification on the front end and by turning a blind eye to public comments, posted videos, and other instances

where these underage users openly announce that they are underage. On information and belief, U.S. teens also are the most lucrative for Defendants when it comes to advertising revenue as well. While all reasons for this are not yet known, it is known that teens spend more time on average than other users and, further, Defendants report exponentially higher revenue per user in connection with United States users on an annual basis.

**D.     Disparities Between Public Statements and Harm to Children**

18.     Peer reviewed studies and available medical science have also identified a particular type of social media and electronic device use associated with major mental health injuries, including depression, self-harm, eating disorders, suicide attempts and ideation, dissatisfaction with life, depression, and sleep deprivation. Large observational studies and experimental results also point to heavy use of certain social media products as cause of increased depression, suicidal ideation, and sleep deprivation among teenagers, particularly teenage girls. Defendants have spent years publicly denying these findings—while internally confirming them.

19.     Meta and Snap have denied for years that their products are harmful or addictive while, in fact, their products *are* harmful and addictive. Defendants knew the truth and chose to conceal it and not disclose to the public or parents of young users, as Defendants knew that such disclosure would prevent them from further, unsupervised growth and product development and that many parents would stop allowing their children to use Defendants' products – as they have a right to do.

20.     In Meta's case, for example only, the Facebook Papers include years' worth of studies and reports discussing the fact that Meta's social media products are addictive and harmful, and that use of those products can and does lead to serious mental health issues in a significant number of users, including things like anxiety, depression, eating disorders, and SSI. This includes research confirming that higher engagement (*i.e.* more sessions and/or time spent over a certain threshold) causes higher negative effect for users, and other hallmarks of addiction (referred to by Meta as "problematic use"). In late 2019, Meta

conducted an "exploratory study" in the United States, aimed at examining "Teen Girls Body Image and Social Comparison on Instagram."[3] The resulting Power Point found that use of Defendants' social media products made certain social comparison-based harms worse for a significant percentage of teen girls. *See id.* at p. 29 (referring to its own product mechanics as "addicting").[4]

21.     The type of harms described in the Facebook Papers relate to specific product mechanisms and product features. Defendants have designed each of their products to contain unique product features which are intended to and do encourage addiction, and unlawful content and use of said products, to the detriment of Defendants' minor users and their families.

22.     Defendants Meta and Snap know exactly the harms that their products are causing yet remain focused on maintaining and increasing user engagement which translates into greater profits for Defendants. On information and belief, there have been studies dating back almost a decade on related topics, which studies are not known or, in some cases, even made available to the general public; but Defendants knew or should have known about these studies as, often times, they related to the products being designed and developed by Defendants and Defendants' scientists and/or engineers.[5]

23.     Defendants Meta and Snap also know that their recommendations and other product features, that is, features whereby Defendants promote and/or send content to users and otherwise try to connect users who, in fact, are often complete strangers, result in disproportionate harms to vulnerable users including children and teens. Yet Defendants continue to reap astronomical profits at the expense of these users.

24.     For example, each of these Defendants has a "friend" and/or "follow"

---

[3] *See* https://digitalwellbeing.org/wp-content/uploads/2021/10/Facebook-Files-Teen-Girls-Body-Image-and-Social-Comparison-on-Instagram.pdf
[4] *Id.*
[5] *See, e.g.*, Sept. 30, 2021, Senate Hearing Transcript, at 1:07:47 (reference to study published in National Academy of Sciences "way back in 2014.").

recommendation feature in their social media product. This refers to a feature whereby Defendants recommend to users other users they may "want" to friend or follow, with the intent that these users will then connect via a friend request mechanism, direct messaging, and similar product features meant to increase engagement among users. These recommendation systems serve the singular purpose of making more money for Defendants in that they are meant to keep users engaged through connections, which connections are suggested, prompted, and encouraged by Defendants. But also, which connections involve complete strangers and where Defendants' own recommendation systems frequently make and perpetuate harmful recommendations.

25.     As it relates to their minor users, Defendants all know that these recommendation and promotion systems cause harm and these harms could be avoided in multiple ways unilaterally (that is, by fixes to Defendants' own platform and irrespective of content). Defendants simply choose to not fix the known defects in their social media products, or provide warnings to users, because doing so would hurt their engagement, growth, and revenue.

26.     Plaintiff does not yet have access to internal documents for all defendants, but those are not needed to know that these defendants employ similar–equally harmful–social media features. Meta's own research concludes that Meta is not the only one causing these harms to teens and children. *See, supra,* "Teen Girls Body Image and Social Comparison on Instagram – An Exploratory Study in the US" (March 2020) ("Instagram is seen as having the highest impact, although TikTok and Snapchat aren't far behind").

27.     On information and belief, Defendants Meta and Snap directed harmful content to I.J.E. via recommendation systems and similar technologies, which harmful content and connections contributed to his injuries and ultimate death.

28.     Meta and Snap also know that their products are contributing to teen depression, anxiety, anger, self-harm, and suicide. Why don't they change these harmful product features and stop utilizing algorithms in connection, at least, with teen accounts?

Because Defendants' top priority is growth and competition concerns, and Defendants see "acquiring and retaining" teens as essential to their survival. Teenagers spend significantly more time on social media than adults (both total time and user sessions—which are usage patterns linked to addiction), represent Defendants' greatest (if not only) growth opportunity in the US, and can be used by Defendants to recruit older and younger family members and friends.

29.     The reality is that children are a priority demographic for Meta and Snap and Defendants will do <u>anything</u> to increase and maintain engagement among them. On October 26, 2021, the New York Times reported on a 2018 internal Meta marketing report lamenting loss of teenage users to competitors' platforms as "an existential threat."[6] Defendants spend billions on these recruiting efforts, and do not care that they are harming children and teens in the process.

30.     Defendants go so far as to study brain and identify vulnerabilities and other areas where they can adjust their products and approach to appeal more to the teen demographic. For example, in December of 2021, Insider reported on an internal Meta document titled "The Power of Identities: Why Teens and Young Adults Choose Instagram." It is clear from this document that Meta, and its competitors, are marketing to children and teens – including in ways meant to exploit the differences between teens and adults.

31.     Identified among Meta's internal documents are other product features that cause harm to teen users, which product features are relatively standard among Defendants' products. For example, product features that enable users to like or love other user's content results in increased addiction and social comparison harms, which Meta considered hiding for the benefit of its users (referred to as "Project Daisy") but ultimately did not.[7]

32.     Examples include but are not limited to photo filters and "like" feature, which products both increase problematic use and cause harmful social comparisons, causing in

---

[6] https://www.nytimes.com/2021/10/16/technology/instagram-teens.html
[7] *See https://www.nytimes.com/2020/01/17/business/instagram-likes.html*

turn depression and anxiety among teens.

33.     Examples from Snapchat include product features like Snap Streaks, which is widely considered to be the most addictive product feature when it comes to teens and social media, to the point where Snap has been asked to disable it – but will not. Snap also offers trophies and intermittent rewards, many of which users do not know about until they earn them. These product mechanisms keep kids addicted and push them into risky behaviors in the hopes of social media recognition.

34.     Another example is Direct Message feature possessed by Defendants' social media products, and lack of restrictions when it comes to teens and children. Defendants' products do something no other product does: they encourage children and teens to use their product, then they make those children and teens accessible to strangers (for example, by permitting public profiles and/or viewing of content posted by these children and teens), then they provide predators with a direct means of communication (Direct Messaging features) that is both unfettered and, according to Defendants, unmonitored. In fact, Defendants monitor and/or have the technology needed to detect critical harm areas, such as sexual exploitation, bullying, and even underage use.

35.     On information and belief, Defendants are incredibly guarded when it comes to the types of data they collect, to the point where they will not even disclose certain, critical information to parents and/or police and other law enforcement upon request.

36.     In the case of Defendant Snap, its product is even more harmful in this regard *because* of its disappearing design. The Snap product is designed in a manner that encourages and enables abuse, which dangerous and defective design serves Snap's economic interests by increasing its user base. At the same time, Defendant Snap's disappearing design and marketing of that feature is particularly harmful to teens who rely on Snap's representations when taking and sending photos, only learning after the fact that recipients have means to save photos.

37.     Defendants are aware of the harms resulting from certain of their product

12

designs and features and are aware of product changes that would make their social media products safer for young users, and that would have made them safer for I.J.E. Meta and Snap refuse and/or disregard such safety measures, however, in the name of corporate profit and engagement. Defendants are unwilling to risk losing popularity and engagement among teen users, even if it means causing affirmative (sometimes fatal) harm to other teens and children as a result.

38.    Meta and Snap know that teens are more vulnerable and suffer harms from use of their social media products at higher rates than adult users. They also know that teens access social media longer and more often than adults. Advertisers are willing to pay a premium for unfettered access to children and teens so Meta and Snap, in turn, work hard to make their social media products as appealing to teens as possible, even though they are harmful to teens.

**E.    Defendants' Focus on Profits Over Safety**

39.    Defendants know the harmful impact their social media products have. Instead of warning users and/or re-designing their products to make them safer, however, they choose enhancing profits over protecting human life.

40.    Large numbers of Meta and Snap users are "addicted" to these social media products. Indeed, the problematic use identified in medical literature is precisely the type of use Defendants have designed their products to encourage through psychological manipulation techniques—sometimes referred to as persuasive design—that is well-recognized to cause all the hallmarks of clinical addiction

41.    Defendant Meta slowly switched its News Feed (in its Facebook and Instagram products) from maximizing time-spent to maximizing sessions, even though it knew that maximizing sessions is harmful to its users. Defendant Meta also knows that its "like" button causes harmful social comparison, and results in anxiety and depression in teens, and Meta leadership ultimately rejected recommendations to launch Project Daisy due to the risk of engagement decrease, advertising revenue loss, and similar economic reasons.

Meta has repeatedly refused to protect its users from harm for fear of offending other users, decreasing teen engagement, and/or losing revenue from its advertisers as a result.

42.     Defendant Snap has designed product features that serve no utility but that help children and predators hide harmful content from parents and authorities, and that promote illegal and dangerous behavior. It's failure to enforce its one account rule further promotes and amplifies bullying and other unwanted interactions, making it impossible for victims to escape the ill effects of the Snap product. Defendant Snap also has implemented inherently addictive and dangerous product features, such as Snap Streaks and various trophies and unknown rewards systems, meant to hook teens at any cost. Likewise, it has implemented various inherently dangerous features, non-communication features over the years, such as Snap Cash, Snap Maps, and My Eyes Only.

43.     Meta and Snap have control over their technology and product design and how it is used and implemented. In all cases, they can choose to keep users safe but, instead, they have chosen instead to make their products more popular and more accessible – at the cost the health and wellbeing of their young users. In other words, Defendants know that their products are harmful and dangerous, could make them less harmful and less dangerous, but opt instead for attracting and retaining new users.

44.     Neither Meta nor Snap incorporate reasonable and necessary safety protocols and checks into their design and development processes, and both Defendants have failed to make their products safer after concerns are voiced and/or actual harms are known. Both Defendants opt for profits and engagement, consistent with the well-known Meta motto, "Move fast and break things." On information and belief, there will be multiple examples of this once discovery is had in this case.

45.     Meta and Snap also represent to users and parents that they utilize technologies to keep users safe when, in fact, they have only implemented such technologies to a limited degree. These technologies do not require content moderation, but rather, function automatically and as part of the product itself. Moreover, these measures are only

made necessary *because* of the content Defendants themselves are recommending. Meta and Snap can stop themselves from recommending and directing young users to violent, harmful, and disturbing content, and they can utilize their technologies to keep a significantly higher number of users safe than what they are currently doing.

46.     Defendants are perfectly capable of enforcing their own Terms of Service, Community Standards, and other guidelines. They can adjust controls in a manner that would better protect their users, especially children and teens, from certain, significant harms caused by Defendants' product features, user setting options, recommendations, and algorithmic-driven product features. Yet, Defendants repeatedly ignore these issues, choosing profits over human life. That is not a choice Defendants have the right to make.

47.     Defendants Meta and Snap do not employ adequate safety controls in the development of their social media products and product features and, once invested in and/or launched, do not address safety issues as those become known.

48.     This is the business model utilized by all Defendants – engagement and growth over user safety – as evidenced by the inherently dangerous design and operation of their social media products. At any point any of these Defendants could have come forward and shared this information with the public, but they knew that doing so would have given their competitors an advantage and/or would have meant wholesale changes to their products and trajectory. Defendants chose to continue causing harm and concealed the truth instead.

**F.     Overview of Claims**

49.     Plaintiff brings claims of strict liability based upon Defendants' defective design of their social media products that render such products not reasonably safe for ordinary consumers or minor users. It is technologically feasible to design social media products that substantially decrease both the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of such products with a negligible increase in production cost.

50.     What's the world has learned from the Facebook Papers is that Meta and its

competitors in the social media space *could* provide social media products that do not promote or amplify harmful content to teens and children – these companies simply choose to not do so as that would mean not relying on harmful algorithms and fewer billions of dollars in revenue.

51.     Plaintiff also brings claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of danger of mental, physical, and emotional harms and sexual abuse arising from foreseeable use of their social media products. The addictive quality of these products and their harmful algorithms are unknown to minor users and their parents.

52.     Plaintiff also brings claims for common law negligence arising from Defendants' unreasonably dangerous Instagram social media products and their failure to warn of such dangers. Defendants knew, or in the exercise or ordinary care should have known, that their social media products were harmful to a significant percentage of their minor users and failed to re-design their products to ameliorate these harms. Defendants also failed to warn minor users and their parents of foreseeable dangers arising out of use of their social media products.

53.     Defendants' own former and/or current developers often do not allow their own children and teenagers to use these social media products.[8] For many years, Defendants have had actual knowledge that their social media products are dangerous and harmful to children but have actively concealed these facts from the public and government regulators and failed to warn parents about these known harms for continued economic gain.

54.     Plaintiff also bring claims under Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.204, *et seq*. The conduct and omissions alleged herein constitute unlawful, unfair, and/or fraudulent business practices prohibited by the Deceptive and Unfair Trade Practices Act.

---

[8] *See, e.g.*, https://www.foxnews.com/tech/former-facebook-exec-wont-let-own-kids-use-social-media-says-its-destroying-how-society-works

55.     Plaintiff's claims do not arise from third party content, but rather, Defendants' product features and designs, including but not limited to algorithms and other product features that addict minor users, amplify and promote harmful social comparison, affirmatively select and promote harmful content to vulnerable users based on their individualized demographic data and social media activity, direct harmful content in great concentrations to vulnerable user groups, put minor users in contact with dangerous adult predators, enable and encourage minors to hide harmful content from their family and friends, encourage and facilitate exploitation and abuse of minors through marketing, recommendation and messaging features, and data policies involving the concealment and/or destruction of information necessary to the protection of minors, and otherwise prioritize engagement (and Defendants' profits) over user safety.

## II.     PARTIES

56.     Plaintiff Jennifer Mitchell is an individual residing in Newport Richey, Florida, and Plaintiff Jennifer Mitchell is in the process of being appointed the administrator of the Estate of her son, I.J.E., who died on August 13, 2019 (his body was found the following day). Plaintiff has not entered into any User Agreements or other contractual relationship with any of the Defendants herein in connection with I.J.E.'s use of their social media products. As such, in prosecuting this action Plaintiff is not bound by any arbitration, forum selection, choice of law, or class action waiver set forth in said User Agreements. Additionally, as Personal Representative of the Estate of I.J.E., Plaintiff Jennifer Mitchell expressly disaffirms all User Agreements with Defendants into which her son may have entered.

57.     Defendant Meta Platforms, Inc., formerly known as Facebook, Inc., is a Delaware corporation with its principal place of business in Menlo Park, CA. Defendant Meta Platforms owns and operates the Facebook and Instagram social media platforms, application that are widely available to users throughout the United States and Florida.

58.     Defendant Snap, Inc. is a Delaware corporation with its principal place of

17

business in Santa Monica, CA. Defendant Snap owns and operates the Snapchat social media platform, an application that is widely marketed by Snap and available to users throughout the United States and Florida.

### III.   JURISDICTION AND VENUE

59.    This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, and Plaintiff and Defendants are residents of different states.

60.    This Court has specific jurisdiction over all Defendants Meta and Snap because these defendants transact business in Florida with Florida residents, Plaintiff's claims set forth herein arise out of and relate to Defendants' activities in the State of Florida, and Defendants have each purposefully availed themselves of the benefit of transacting business in Florida with Florida residents. For example, these defendants advertise and encourage use of the products at issue in Florida; enter into millions of contracts with Florida residents, including as relating to use of these same social media products; provide access to significant percentages of Florida's population to these social media products; generate and send emails and other communications to Florida residents, including I.J.E.; design and distribute push notifications, recommendations, and other communications to Florida residents, aimed at encouraging addiction and use of Defendants' social media products, as they did here; actively and extensively collects personal and location information belonging to Florida residents, including I.J.E.; and generate revenue from Florida activities that dwarfs what most Florida -based businesses generate. In some cases, Defendants may also have employees located in the state of Florida, who work remotely while located in this State, and/or be registered to do business in the State of Florida.

61.    Nor will Defendants stop interacting with Florida residents or bar Florida residents from distribution and use of their social media products, because revenue they obtain because of Florida users and having users in Florida is too significant. Walling off distribution to Florida would have a devastating impact on Meta and Snap's entire business,

18

irrespective of their total number of users worldwide.

62.     Plaintiff is resident of Florida and decedent I.J.E. acquired and used Defendants' products in Florida, and Plaintiff suffered injuries here as a result.

63.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## IV.     FACTUAL ALLEGATIONS

### A.     Facebook and Instagram Background

64.     Facebook is an American online social network service that is part of the Meta Platforms. Facebook was founded in 2004, at which time, Facebook was nothing like the product it is today. In fact, when Facebook was first founded, only students at certain colleges and universities could use the social media product – which changed by 2006, such that anyone with an email address could now use it. Facebook became the largest social network in the world, with nearly three billion users as of 2021, and about half that number were using Facebook every day. The company's headquarters is in Menlo Park, California. Facebook recently changed its name to, and is referred to herein and collectively with Instagram, as Meta.

65.     Instagram is a photo sharing social media application. Its original focus was to facilitate communication through images by featuring photos taken on mobile devices. Instagram launched in October 2010 and Facebook acquired it for $1 billion in April 2012. Once acquired, Instagram experienced exponential growth, design, and development changes. It went from 10 million monthly active users in September of 2012 to 50 million weeks after the acquisition, to more than 600 million by December of 2016, and it continues to grow. Meta instituted dozens of product changes (also known as "growth hacks") that drove this increased engagement, but at the expense of the health and well-being of Instagram's users—especially teens and children.

66.     Meta's recommendation-based feeds and product features promote harmful

content. Meta's algorithms are programmed to prioritize number of interactions and not quality of interactions. Worded otherwise, Defendants promote and amplify content based on engagement objectives and not the health and well-being of their users, which renders their social media products inherently dangerous and defective, particularly when used by teens and children.

67.   Both the Facebook and Instagram products show users a "feed." A user's "feed" is a comprised of a series of photos and videos posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram.

68.   Meta exerts control over a user's Instagram "feed," including through certain ranking mechanisms, escalation loops, and/or promotion of advertising and content specifically selected and promoted by Meta based on, among other things, its ongoing planning, assessment, and prioritization of the types of information most likely to increase engagement. In the case of certain user groups, like teens, this control translates to deliberate and repeated promotion of harmful and unhealthy content, which Meta knows is causing harm to its young users.

69.   The Instagram product also has a search feature called "Explore," where a user is shown an endless feed of content that is selected by an algorithm designed by Meta based upon the users' demographics and prior activity in the application. This is not content the user has searched for our requested. Instead, it is content Meta selects via its algorithms (which Meta in turn programs to increase engagement and in other ways Meta knows to be harmful to users, but more profitable to Meta, as well as paid advertisements created with Meta's assistance or approval, and the like.

70.   Meta designs and operates its product in a manner that promotes harmful and/or unhealthy content. Meta is aware of these inherently dangerous product features and has repeatedly decided against changing them and/or implementing readily available and relatively inexpensive safety measures, for the stated purpose of ensuring continued growth, engagement, and revenue increase.

71.    The Instagram product also has features known as "Reels" and "Stories," which promote the use of short videos and temporary posts, respectively. These products were developed to appeal to teens and Meta knows that these products are addictive, as well as defective.

72.    Instagram profile and privacy settings also cause harm. Users' profiles on Instagram may be public or private, which is a product feature over which Meta exercises complete control. On public profiles, any user can view the photos, videos, and other content posted by the user. On private profiles, the user's content may only be viewed by the user's followers, which the user must approve. At all times relevant, Instagram profiles were public by default and Instagram allowed all users to message and send follow requests to underage users. But even now, when Instagram claims that it is defaulting certain categories of users into private profiles, all a user need do is change the profile setting and, once again, Instagram will allow all users to message and send follow requests to underage users. Meta can protect users from this specific harm, can do so immediately, and chooses to not do so as a matter of engagement and growth.

73.    Permitting public profiles for underage users serves no critical purpose in terms of product functionality but, instead, it increases user engagement during onboarding (when a user first starts using a social media product) by increasing user connections and generally by providing all users with greater access to other users, in this case, irrespective of their age. Unfortunately for young children and teens, a numerically significant percentage of those would-be connections are harmful. Defendants are aware of these harms and have opted to not make necessary and cost-effective changes to prevent them.

74.    Defendant Meta's Direct Message settings also permit and encourage harm to vulnerable users. Harmful and dangerous interactions occur because of the Instagram direct message feature and current user settings, that is, Meta's chosen settings provide strangers (good or bad) with direct and unsupervised access to children and teens. Again, however, Meta opts for engagement over safety.

75.     Meta's allowance of multiple accounts, refusal to verify age, identity, even authenticity of email addresses further exacerbates the harms by making it impossible to avoid unwanted interactions. Other users can literally open accounts as fast as those accounts can be blocked and, when coupled with the excessive and addictive usage habits Meta promotes among teens, these features create a perfect storm for depression, anxiety, and Suicide and Self-Harm.

76.     Meta's push notifications and emails encourage addictive behavior and are designed specifically to increase use of its social media products. In the case of Instagram, Defendant Meta collects individualized data – not just about the user, but also about the user's friends and contacts – and then selects content and notification frequency for its users and notifies them via text and email. Meta's notifications to individual users are specifically designed to, and do, prompt them to open Instagram and view the content Instagram selected, increasing sessions, and resulting in greater profits to Instagram. More to the point, even the format of these notifications has been designed and re-designed with the specific purpose of pulling users back onto the social media platform.

77.     Instagram also incorporates several product features that serve no functionality purpose, but that do make Meta's product more appealing to children and teens (*i.e.*, "likes" and filters, as well as avatars, emojis, and games) while simultaneously increasing social comparison pressure and resulting harm (*i.e.*, "likes" and filters). The harm from these product features does not relate to a single "like" or filter, or any specific series of content or potential content.  Rather, it is the product itself.

78.     Instagram also creates images and GIFs for users to post on their videos and pictures. Meta has also acquired publishing rights to thousands of hours of music, which it provides to its users to attach to the videos and pictures that they post on Instagram. The GIFs, images, and music are integral to the user's Instagram post and are, in fact, designed to encourage posting. Indeed, in many cases, the only content in a user's Instagram post is the image, GIF or music supplied by Meta. When users incorporate images, GIFs, and music

supplied by Meta into their postings, Meta is functioning as a co-publisher of such content. An Instagram user who incorporates images, GIFs or music supplied by Meta into their post is functionally equivalent to a novelist who incorporates illustrations into their story. Instagram can no longer characterize the images, GIFs, and music it supplies to its users as third-party content, just as the novelist cannot disclaim responsibility for illustrations contained in their book. Meta has made the deliberate decision to collaborate with its users in this regard and, as evidenced by Meta's internal documents, Meta's decision is motivated by the fact that such collaboration results in increased engagement and more profits for Meta itself.

79.     Meta also has ownership and/or licensing, and other legal, rights in all third-party content, such that it is not "third-party content" at all. In 2012, Meta revised its Instagram Terms of Service to the following, [9]

> To help us deliver interesting paid or sponsored content or promotions, you agree that a business or other entity may pay us to display your username, likeness, photos (along with any associated metadata), and/or actions you take, in connection with paid or sponsored content or promotions, without any compensation to you.

80.     Its current terms (effective January 4, 2022) are different, but still grant Meta the right to use all third-party content at Meta's sole and unilateral discretion.

81.     Meta directly profits from the videos and pictures its users create in collaboration with Meta, as described above.

82.     Meta knows that it is harming teens yet, when faced with recommendations that will reduce such harms, Meta's leadership consistently opts for prioritization of profit over the health and well-being of its teen users.

83.     Meta knows that underage users are on its platform and has deliberately designed its product in a manner intended to evade parental authority and consent.

---

[9] https://www.theverge.com/2012/12/18/3780158/instagrams-new-terms-of-service-what-they-really-mean

84.   Meta's products are used by many millions of children every day.

**B.   Snapchat Background**

85.   Snapchat was founded in 2011, by three Stanford college students, and quickly became a wildly popular social media product among U.S. teens. It is one of the most widely used social media products in the world and is used by more than 69% of all U.S. teens (age 13 to 17).[10] Snap's headquarters is in Santa Monica, California.

86.   Snapchat started as a photo and short video sharing social media application that allows users to form groups and share posts or "Snaps" that disappear after being viewed by the recipients. The Snapchat product became well-known for its self-destructing content feature. Specifically, the Snapchat product allows users to form groups and share posts or "Snaps" that disappear after being viewed by the recipients. However, the Snapchat social media product quickly evolved from there, as its leadership made design changes and rapidly developed new product features intended to and that did increase Snapchat's popularity among teen users.

87.   In 2012, Snap added video capabilities to its Snapchat product, pushing the number of "snaps" to 50 million per day; in 2013, "Stories" and "Chat" features; in 2014, live video chat capabilities, "Our Story," Geofilters and Community Geofilters, and Snapcash.

88.   By 2015, advertisements were pervasive on Snapchat and, by 2018, 99% of Snap's total revenue came from advertising, according to internal company records. In other words, like Meta, Snap decided to monetize its userbase and began changing its product in ways that made its product even more harmful to users but that paved the way for growth, engagement, and profits for Snap and its leadership and investors.

89.   By 2015, Snapchat had over 75 million monthly active users and was the most popular social media application amongst American teenagers in terms of number of users

---

[10] *See* https://www.smartinsights.com/social-media-marketing/social-media-strategy/snapchat-statistics/

and time spent using the platform. Snap currently estimates having between 92.8 and 96.6 million users in the United States, with at least 17 to 17.7 million of those being children under the age of 18. Against this backdrop, Snap advertises and promotes its product as safe and fun—which could not be further from the truth

90.     The Snapchat product incorporates several product features that serve no purpose other than to create dependencies on Snap's social media product, which dependencies in turn cause sleep deprivation, anxiety, depression, anger, shame, interpersonal conflicts, and other serious mental and physical harms.

91.     These include hidden rewards, such as trophies, streaks, and scores (signals of social recognition like the "likes" metrics available in other platforms), which features serve no practical purpose other than to addict and incentivize users to engage in as much Snap-related behavior as possible.[11] These features encourage teens to engage in excessive and risky behaviors, which dangers have been known to Snap for years.

92.     Prior to 2020, Snap created and distributed a hidden reward system that allowed users to unlock certain badges once they achieved something within the app – called Trophies. Snapchat had more than 50 different "locked" emojis the represented trophies and users and users would only find out what unlocked each emoji once it was unlocked. Some examples of what could earn a trophy include things like sending a Snap between 4 and 5 am, getting your Snap posted on a local story, sending 500 video Snaps, and hitting a Snapchat score of 500,000. There were others, unknown to users.

93.     Snap's Streaks product is widely considered to be one of the most addictive social media products, "especially to teenagers."[12] *See also* FBD 37/21, "Teen Meaningful

---

[11] *See* https://learn.g2.com/snapchat-trophies; *see also* https://www.online-tech-tips.com/smartphones/snapchat-trophies-are-gone-but-this-snapchat-charm-list-will-help/ ("Snapchat is one of the most addictive social media platforms. It's so popular among users for two reasons. One is the Snapchat's visual add-ons like filters and text that you can apply when you send a message. The second reason is the app's reward system that gives you awards the more you send those messages to other users.")
[12]*See* https://beanfee.com/articles/why-are-snapchat-streaks-so-addictive/; *see also, e.g.* https://abcnews.go.com/Lifestyle/experts-warn-parents-snapchat-hook-teens-streaks/story?id=48778296.

Interactions and Feed post Feedback – Focus Groups" (May 2018), at p. 5 ("Streaks are a very important way for teens to stay connected. They are usually with your closest friends and they are addictive."). Users can gain streaks on Snapchat by exchanging snaps for several consecutive days. They must send and receive at least one snap from the same user within a 24-hour period, otherwise the streak will be lost, thereby making sure that people return every day.

94.     Like Snap trophies and streaks, the Snap Score feature also keeps users addicted, trying new things, and coming back for more. No one knows precisely how a Snap Score is determined, though Snap has said that it uses a "special equation" that incorporates all the ways someone might use Snapchat and other undisclosed criteria.

95.     Snapchat also incorporates various filters and add-ons, which again serve no practical purpose, but are addictive to teens and incentivize engagement and, at times, dangerous behavior. For example, Snap at one point created and distributed a Speed Filter, encouraging users to record real-life speed then overlay that speed onto a mobile photo or video. Snap discontinued this feature at some point, but only after several children had died while trying to obtain a Snapchat speed filter, and only after Snap was sued.

96.     Snapchat also and incorporates a "My Eyes Only" product, which many parents do not know about – including the Plaintiff in this case. The My Eyes Only Product encourages and enables young users to hide harmful content from parents by allowing them to hide content in a special tab that requires a passcode, and where content cannot be recovered – even by Snap itself – without the correct passcode. In fact, the content self-destructs if a user attempts to access the hidden folder with the wrong code. In other words, My Eyes Only has no practical purpose or use, other than to hide potentially harmful content from parents and/or legal owners of the devices used to access Snap.

97.     Snap's disappearing messages and My Eyes Only feature are also incredibly problematic products because they are designed to destroy information relating to minors, which information parents have a legal right to know about and which information would

otherwise be in Snap's possession, custody, and/or control.

98.     Like Meta, Snap also sends push notifications and emails to encourage addictive behavior and to increase use of its Snapchat product. Snap's communications are triggered and based upon information Snap collects from and about its users, and Snap "pushes" these communications to teen users in excessive numbers and disruptive times of day. These notifications are specifically designed to, and do, prompt them to open Snapchat and view the content Snapchat selected, increasing sessions, and resulting in greater profits to Snap. Even the format of these notifications has been designed to pull users back on to the social media platform—irrespective of a user's health or wellbeing.

99.     Snapchat incorporates several other product features that serve no functionality purpose, but that do make Snap's product more appealing to children and teens (*i.e.*, avatars, emojis, and games) while simultaneously using known mechanisms to addict those same children and teens (*i.e.* streaks and trophies offering unknown rewards). These features and ones discussed above were addictive to I.J.E. and were targeted to underage users like him. Indeed, I.J.E. died while taking and posting videos to his Snapchat.

100.    Snap uses an algorithm or similar technology to suggest connections, that is, Snap sends messages to users based on some secret formula Snap uses to determine whether someone should "friend" someone else. This is known as "Quick Add," and these Snap-initiated messages result in exposure to harmful contacts, bullying, and dangerous predators. This feature contributes nothing to the product itself and serves no informational or communication purpose. Like Meta's product, this product is designed to reinforce addiction and increase the odds of maintaining more users for longer. But this product also means that Snap is actively connecting minors to complete strangers, some of whom utilize Snap's product and disappearing product features to harm minor users.

101.    Snapchat users also have an "Explore" feed that displays content created by other users around the world. These product features are designed to grab and keep users' attention for as long as possible each day, and have led many people, from psychologists to

27

government officials, to describe Snapchat as "dangerously addictive."

102.     As with Defendant Meta, Snap's algorithms and/or similar technologies determine the content that gets recommended and/or populates its user experience on the Snapchat social media product. This includes content sent directly from Snap to its users, for Snap's own purposes, and prior to any sort of user search or request for such content. And as with Defendant Meta, Snap knows or should know that its technology is promoting and amplifying harmful content to children and teens. In I.J.E.'s case, this included drug and self-harm related content – that is the content the Snapchat product deemed reasonable and appropriate for a teenaged boy.

103.     Snapchat also offers several unique messaging and data features. As discussed above, it is perhaps most famous for its self-destructing content design feature, which appeals to minors and makes it more difficult for parents to monitor their children's social media activity. This is an inherently dangerous product feature because it both encourages and allows minor uses to exchange harmful, illegal, and sexually explicit images with adults, and provides those same adults with a safe and efficient vehicle to recruit victims. Snapchat is a go-to application for sexual predators because of this product feature.[13]

104.     This product feature serves no practical purpose – that is, maintaining Snaps would in no way impact would in no way impact the communications themselves.

105.     For years Snap has received reports of child abuse and bullying occurring through its product and because of its product features,[14] yet has kept those features in place as removing them would result in considerable impact on the popularity of Snap's social media product.

106.     Harmful and dangerous interactions likewise occur because of these and other Snapchat messaging features, which provide direct and unsupervised access to minors.

---

[13] *See, e.g.*, https://phonespector.com/blog/what-are-the-dangers-of-snapchat-to-avoid/
[14] *See, e.g.*, https://www.forbes.com/sites/zakdoffman/2019/05/26/snapchats-self-destructing-messages-have-created-a-haven-for-child-abuse/?sh=411b8e1d399a (Snapchat Has Become A 'Haven for Child Abuse' With Its 'Self-Destructing Messages').

107.    In 2014, Snapchat added "Stories" and "Chat" features that allowed users to post longer stories that could be viewed by users outside the user's friends. As with Meta's algorithms, Snap's technology promotes and amplifies harmful content as a means of increasing user engagement and growth opportunities. Snap has actual knowledge of the harm it is causing its users, and consistently prioritizes its own profits regardless. Users also have reason to believe that they can obtain Snapchat rewards by posting such content.

108.    Snapchat also allows users to enable the sharing of their location, through a tool called Snap Map, which allows the users' followers (and the public for Snaps submitted by the users) to see the user's location on a map. At all times relevant, this feature was available to all users, including minors. This is an inherently dangerous product feature, which serves no practical purpose – but that does provide strangers and predators with access to the location of minor victims. This product feature has directly contributed to stalking and other, physical harms and assaults perpetrated on minors, and these are harms known to Snap.

109.    But also, Snap has developed artificial intelligence technology that detects adult users of Snapchat who send sexually explicit content to children and receive sexually explicit images from children. This technology furnishes Snap with actual knowledge that a significant number of minor users of Snapchat are solicited to send, and do send, sexually explicit photos and videos of themselves to adult users in violation of 18 U.S.C. § 1591(a)(1)-(2). Snap *could* protect its minor users, but in many instances, does not.

110.    These are just some examples of Snapchat's harmful product features.

111.    Snap has also developed images for users to decorate the pictures or videos they post, and Snap has developed Lenses which are augmented reality-based special effects and sounds for users to apply to pictures and videos users post on Snapchat, and World Lenses to augment the environment around posts. Snap also has acquired publication rights to music, audio, and video content that its users can incorporate in the pictures and videos they post on Snapchat.

112.    These images, Lenses, and licensed audio and video content supplied and

created by Snapchat frequently make a material contribution to the creation or development of the user's Snapchat posts. Indeed, in many cases, the *only* content in a user's Snapchat post are images, Lenses, and licensed audio and video content supplied and created by Snapchat. When users incorporate images, Lenses, music, audio, and video content supplied by Snapchat posts, Snapchat makes a material contribution to the creation and/or development of their Snapchat postings and becomes a co-publisher of such content. When malign users incorporate images, Lenses, music, audio, and video content supplied by Snapchat to their posts, this enhances the psychic harm and defamatory sting that minor users experience from third-party postings on Defendant's platform.

113.    Moreover, Snap contracts for legal rights in this third-party content, such that it is not "third-party content" at all. Snap's current Terms of Service grant Snap several, sweeping sets of legal rights, from licensing to ownership, as follows (and for example only as there are several provisions in Snap's Terms of Service that address legal rights over user content, comments, and other usage and activities),

### 3. Rights You Grant Us

Many of our Services let you create, upload, post, send, receive, and store content. When you do that, you retain whatever ownership rights in that content you had to begin with. But you grant us a license to use that content. How broad that license is depends on which Services you use and the Settings you have selected.

For all content you submit to the Services, you grant Snap and our affiliates a worldwide, royalty-free, sublicensable, and transferable license to host, store, cache, use, display, reproduce, modify, adapt, edit, publish, analyze, transmit, and distribute that content. This license is for the purpose of operating, developing, providing, promoting, and improving the Services and researching and developing new ones. This license includes a right for us to make your content available to, and pass these rights along to, service providers with whom we have contractual relationships related to the provision of the Services, solely for the purpose of providing such Services.

114.    Snap directly profits from the videos and pictures and other content its users create in collaboration with Snap, as described above

115.    Snap knows that it is harming teens yet consistently opts for prioritization of profit over the health and well-being of its teen users.

116.    Millions of teen and children use Snap's inherently dangerous and defective social media product every, single day.

**C.    Defendants' Applications Are Products**

117.    There is no dispute that the above-described social media products are designed and manufactured by Defendants, and further, Defendants refer to them as such.

118.    Defendants' products are designed to be used by minors and are actively marketed to minors across the United States. Defendants market to minors through their own marketing efforts and design, and through their approval and permission to advertisers who create and target ads to young users. Meta documents establish that Meta spends millions of dollars researching, analyzing, and experimenting with young children to find ways to make its product more appealing and addictive to these age groups, as these age groups are seen as the key to Meta's long-term profitability and market dominance. But also, Meta documents establish that it is not the only one, and that other social media companies, including Meta's co-defendants in this case, invest heavily to appeal to teens and underage users. *See, e.g.*, https://www.businessinsider.com/leaked-docs-facebook-papers-instagram-competition-tiktok-youtube-snapchat-2021-12?op=1#whats-so-great-about-tiktok-one-slide-said-2 (quoting from disclosed Facebook Papers that address the reasons why teens love Snapchat),





REDACTED for CONGRESS

119.    Defendants also are aware that large numbers of children under the age of 18 use its product without parental consent. Snap's user terms provide for a requirement of parental consent for use of its social media product for all persons under 18 (which is a requirement Meta should have as well). Yet Snap then designs its social media product in a manner intended to allow and not prevent such use, including failure to verify age and identification and allowing and encouraging multiple accounts.

120.    Defendants have designed their products in a manner that allows and/or does not prevent such use to increase user engagement and, thereby, increase their own profits.

**D. Defendants' Business Model is Based on Maximizing User Screen Time and Defendants Know That their Products are Addictive**

121.　Defendants advertise their products as "free," because they do not charge their users for downloading or using their products. What many users do not know is that, in fact, Defendants make a profit by finding unique and increasingly dangerous ways to capture user attention and target advertisements to their users. Defendants receive revenue from advertisers who pay a premium to target advertisements to specific demographic groups of users in the applications. Defendants also receive revenue from selling their users' data to third parties.

122.　The amount of revenue Defendants receive is based upon the amount of time and level of user engagement on their platforms, which directly correlates with the number of advertisements that can be shown to each user.

123.　Defendants use unknown and changing rewards that are designed to prompt users who consume their social media products in excessive and dangerous ways. Defendants know, or in the exercise of ordinary care should know, that their designs have created extreme and addictive usage by their minor users, and Defendants knowingly or purposefully designed its products to encourage such addictive behaviors. For example, all the achievements and trophies in Snapchat are unknown to users. The Company has stated that "[y]ou don't even know about the achievement until you unlock it." This design conforms to well-established principles of operant conditioning wherein intermittent reinforcement provides the most reliable tool to maintain a desired behavior over time.

124.　This design is akin to a slot machine but marketed toward minor users who are even more susceptible than gambling addicts to the variable reward and reminder system designed by Snapchat. The system is designed to reward increasingly extreme behavior because users are not actually aware of what action will unlock the next award.

125.　Instagram, like Snapchat, is designed around a series of features that do not add to the communication utility of the application, but instead seek to exploit minor users'

susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards, including "likes" and "followers." In the hands of children, this design is unreasonably dangerous to the mental well-being of underage users' developing minds.

126.    According to industry insiders, Defendants have employed thousands of psychologists and engineers to help make their products maximally addicting. For example, Instagram's "pull to refresh" is based on how slot machines operate. It creates an endless feed, designed to manipulate brain chemistry and prevent natural end points that would otherwise encourage users to move on to other activities.

127.    Defendants do not warn users of the addictive design of their product, and did not warn Jennifer Mitchell or I.J.E. On the contrary, Defendants actively conceal the dangerous and addictive nature of their products, lulling users and parents into a false sense of security. This includes consistently playing down their products' negative effects on teens in public statements and advertising, making false or materially misleading statements concerning product safety, and refusing to make their research public or available to academics or lawmakers who have asked for it.

128.    Defendants have repeatedly represented to the public and governments around the world that their products are safe and not addictive. Even now, Snaps Terms of Service claim "We try hard to keep our Services a safe place for all users."[15]

129.    Again, the amount of revenue Defendants receive is based upon the amount of time and user engagement on their platforms, which directly correlates with the number of advertisements that can be shown to each user. In short, Defendants opted for user engagement over the truth and user safety.

130.    Defendants' social media products are built around a series of design features that do not add to the communication and communication utility of the applications, but instead seek to exploit users' susceptibility to persuasive design and unlimited accumulation

---

[15] *See* Snap, Inc. Terms of Service, ¶ 9.

of unpredictable and uncertain rewards (including things like "likes" and "followers" and "views" and "streaks" and "trophies"). This design is unreasonably dangerous to the mental well-being of underage users' developing minds, and these social media companies know it.

131.    Defendants know that their products are addictive, and that millions of teen users want to stop using them but cannot.

132.    Defendants engineer their products to keep users, and particularly young users, engaged longer and coming back for more. This is referred to as "engineered addiction," and examples include features like bottomless scrolling, tagging, notifications, and live stories.

133.    Defendants spend billions of dollars marketing their products to minors and have deliberately traded in user harm for the sake of their already astronomical revenue stream.

**E.    Defendants Have Designed Complex Algorithms to Addict Teen Users and Their Business Models Are Based on Maximizing User Screen Time**

134.    Meta and Snap have intentionally designed their products to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by the most advanced computer algorithms and artificial intelligence available to three of the largest technology companies in the world.

135.    Meta and Snap's algorithms and related technologies select content for minor users not based on what they anticipate the user will prefer or to enhance their social media experience, but rather for the express purpose of habituating users to the Defendants' social media products. Defendants' technologies do not provide a neutral platform but rather specify and prompt the type of content to be submitted and determine particular types of content its technologies promote.

136.    Defendants designed and have progressively modified their products to promote problematic and excessive use that they know is indicative of addictive and self-destructive use.

35

137.    One of these features—present in Snapchat and Instagram—is the use of complex algorithms to select and promote content that is provided to users in an unlimited and never-ending "feed." Defendants know that algorithm-controlled feeds promote unlimited "scrolling"—a type of use those studies have identified as detrimental to users' mental health—however, this type of use allows Defendants to display more advertisements and obtain more revenue from each individual user.

138.    Defendants' algorithm-controlled features are designed to promote content likely to increase user engagement, which often means content Defendants know to be harmful. This is content that users might otherwise never see but for Defendants' sorting, prioritizing, and/or affirmative pushing of such content to their accounts.

139.    In the words of one, high-level departing Meta employee,

In September 2006, Facebook launched News Feed. In October 2009, Facebook switched from chronological sorting to an algorithmic ranking. 10 years later, in July 2019, Sen. Josh Hawley introduced a bill to the US Senate that would ban features in app feeds, such as infinite scroll.

The response in 2006 was largely positive; the response in 2009 was negative from a vocal minority, but still largely positive; the response in 2019 was largely "lol, wut?" If I had to guess, the response to government regulation around engagement centric information feeds in 2026 will be "Omg finally".

"Why We Build Feeds" (October 4, 2019), at p. 1.[16]

140.    The addictive nature of Defendants' products and the complex and psychologically manipulative design of their algorithms and related technologies is unknown to ordinary consumers, particularly minors.

141.    Defendants go to significant lengths to prevent transparency, including posing as a "free" social media platform, burying advertisements in personalized content, and

---

[16] https://www.documentcloud.org/documents/21600853-tier1_rank_exp_1019

making public statements about the safety of their products that simply are not true.

142.    Defendants also have developed unique product features designed to limit, and have in other ways limited, parents' ability to monitor and prevent problematic use by their children.

143.    Defendants' recommendation technologies adapt to promote whatever content will trigger minor users' engagement and maximize their screen time. Defendants' algorithm designs do not distinguish, rank, discriminate, or prioritize between content based on whether it is helpful or harmful to the psychic well-being of their minor users. Once a minor user engages with abusive, harmful, or destructive content, Defendants' algorithms will direct the minor user to content that is progressively more abusive, harmful, and destructive to maximize the user's screen time.

144.    Defendants' recommendation technologies are not simply tools meant to facilitate the communication and content of others but are content in and of themselves. Defendants' recommendation technologies do not function like traditional search engines that select content for users based on user inputs; they direct minor users to content based on far more than the individual users' viewing history. Defendants' algorithms make recommendations not simply based on minor users' voluntary actions but also the demographic information and social media activity of the users' friends, followers, and cohorts. The user data that Defendants' recommendation technologies use to select content therefore encompasses far more information than voluntarily furnished by the user and include private information about the user not knowingly provided.

145.    These addiction-driven recommendation technologies are designed to be content neutral. They adapt to the social media activity of individual users to promote *whatever* content will trigger a particular user's interest and maximize their screen time. That is, prior to the point when Meta and Snap have addicted their users and are then able to influence user preferences, their designs do not distinguish, rank, discriminate, or prioritize between types of content. For example, if the design can increase User One engagement with

elephants and User Two engagement with moonbeams, then Defendants' design will promote elephant content to User One and moonbeam content to User Two. These types of recommendation technologies are solely quantitative devices and make no qualitative distinctions between the nature and type of content they promote to users – as long as those promotions increaser user engagement.

**B.     Minor Users' Incomplete Brain Development Renders Them Particularly Susceptible to Manipulative Algorithms with Diminished Capacity to Eschew Self-Destructive Behaviors and Less Resiliency to Overcome Negative Social Media Influences**

146.    The human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotional regulation, and impulse control.

147.    The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature.

148.    During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout

adolescence and into young adulthood.

149.    In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and for mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

150.    The algorithms in Defendants' social media products are designed to exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, they experience enhanced dopamine responses to stimuli on Defendants' social media platforms and are therefore much more likely to become addicted to Defendants' products; exercise poor judgment in their social media activity; and act impulsively in response to negative social media encounters. Defendants also know, or in the exercise of reasonable care should know, that minor users of their social media products are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants knowingly designed their social media products to be addictive to minor users and failed to include in their product design any safeguards to account for and ameliorate the psychosocial immaturity of their minor users.

F.    **Defendants Misrepresent the Addictive Design and Effects of Their Social Media Product**

151.    During the relevant time period, Meta and Snap stated in public comments that their products are not addictive and were not designed to be addictive. Defendants knew or should have known that those statements were untrue.

152.    During the relevant time period, Meta and Snap advertised via commercials and/or third parties that their products were fun and safe to use, and that Defendants

employed their technologies to ensure safe and age-appropriate experiences. Defendants knew or should have known that those statements were untrue.

153.     Neither Meta or Snap warned users or their parents of the addictive and mentally harmful effects that the use of their products was known to cause amongst minor users. On the contrary, Defendants have gone to significant lengths to conceal and/or avoid disclosure as to the true nature of their products.

**G.     Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties**

154.     Plaintiff seeks to hold Defendants Meta and Snap accountable for their own alleged acts and omissions. Plaintiff's claims arise from Defendants' status as designers and marketers of dangerously defective social media product, as well as Defendants' own statements and actions, not as the speaker or publisher of third-party content.

155.     Defendants' have designed their products to be addictive. For example, Defendants have developed and modified product features like the continuous loop feed and push notifications, to incentivize users to stay on the product as long as possible and to convince users to log back on. Defendants even calculate the most effective time to send such notifications, which in the case of teen and tween users often means in the middle of the night and/or during school hours. Essentially, the times they are least likely to have access to Defendants' social media products, which also—as Defendants know—are the times that their health and well-being necessitate them not being on Defendants' social media product. Defendants' products are designed to and do addict users on a content neutral basis.

156.     The structure of these social media products and the technologies Defendants' design and utilize are, standing alone, harmful to users and irrespective of content. For example, a primary purpose of Defendants' algorithm designs is to determine individual user preferences first so that Defendants can then influence user behavior and choices second— which is particularly dangerous in the case of teens.

157.    In the case of Meta, for example, Meta uses its product both to "experiment" on and test its users in ways heretofore unimagined, but also, it seeks to control user behavior through product features and capabilities and for the specific purpose of acquiring and retaining users.

158.    On a content neutral basis, the manipulation and control these Defendants knowingly wield over their users daily is profoundly dangerous.

159.    Defendants are responsible for these harms. These harms are caused by Defendants' designs and design-decisions, and not any single incident of third-party content.

160.    Yet Defendants failed to warn minor users and their parents of known dangers arising from anticipated use of their social media products. These dangers are unknown to ordinary consumers but are known to Defendants. Moreover, these dangers do not arise from third-party content contained on Defendants' social media platforms. This lawsuit does not involve a suit against a web browser provider for making available third-party content. To the contrary, Defendants,

    a.  Design and constantly re-design their social media products to attract and addict teens and children, their "priority" user group.

    b.  Design and continue to operate their social media products to ensure that teens and children can obtain unfettered access, even over parental objection.

    c.  Know when teens and children are opening multiple accounts and when they are accessing their products excessively and in the middle of the night.

    d.  Work with advertisers and influencers to create and approve harmful content and provide direct access to teens and children – a user population Defendants know to be vulnerable.

    e.  Operate and provide the above social media products with the single-minded goal of increasing user engagement, including but not limited to things like maintaining harmful social comparison features and approving product programming that promotes harmful content over clear dangers to user safety.

161.     While it may be a third party creates a particular piece of harmful content, the teens and children harmed by Defendants' social media products are not being harmed by a single piece of harmful content. They are being harmed by Defendants' products, programming, and decisions to expose teens and children to harmful product features and to show teens and children a constant barrage of harmful content to obtain more advertising revenue and increase engagement.

162.     I.J.E. and children like him do not open social media accounts in the hopes of become addicted, sleep deprived, anxious, angry, and depressed. Nonetheless, such children *do* become addicted, leading them to engage in foreseeable addict behaviors, such as lying to their parents, hiding their use of social media, losing control, and becoming irritable, even violent, when access is denied. These and other behaviors can and do result in serious harm to Defendants' minor users.

163.     I.J.E. and children like him do not start using social media in the hopes of being exposed to product features that cause harm to them. Yet the use of Instagram and Snapchat involves harmful forms of social comparison and exposes children to bullying, exploitation, and glorification of self-harm and suicide, which attacks they cannot fend off because of Defendants' access and messaging features. These features inevitably push such children towards harmful "rabbit holes," causing anxiety, depression, eating disorders, anger, isolation and loneliness, and self-harm—harms that both Meta and Snap chat, on information and belief, acknowledge internally.

164.     The harms at issue in this case do not relate to or arise from third party content, but rather, Defendants' product features and designs, including algorithms and other technology that (a) addicts minor users to their products; (b) amplify and promote harmful social comparison through product features; (c) affirmatively select and promote harmful content to vulnerable users based on its individualized demographic data and social media activity; and (d) put minor users in contact with dangerous adult predators and otherwise expose to them to seemingly unstoppable unwanted interactions from persons not on their

friend list or equivalent. Indeed, the foregoing are merely examples of the kinds of harms at issue in this case.

165.    Defendants' products are addictive on a content neutral basis. Defendants design and operate their social media products in a manner intended to and that does change behavior and addict users, including through a natural selection process that does not depend on or require any specific type of third-party content, as well as mechanisms and features meant to release dopamine. Defendants deliberately addict teen users and the harms resulting from these addictions are foreseeable, even known, to Defendants.

166.    Defendants' have designed other product features for the purpose of encouraging and assisting children in evasion of parental oversight, protection, and consent, which features are wholly unnecessary to the operation of Defendants' product. This includes but is not limited to Defendants' wholesale failure to check identification or verify validity of user-provided email credentials, while simultaneously implementing product design features (such as easier ability to switch between accounts, in the case of Meta) meant to ensure easy access by children and teens, irrespective of parental consent. Likewise, Defendants—even those who claim to permit only one account—know that teen users are opening multiple accounts and fail to prevent such abuses.

167.    Defendants also promote, encourage, and/or otherwise contribute to the development of harmful content. This Complaint has quoted from just a few of the thousands of Meta documents disclosed by the Facebook whistleblower, which establish this, and Plaintiff anticipate finding the same types of evidence in discovery with TikTok and Snap. One of biggest hurdles to discovery of these claims and the harms Defendants have caused is that none of these defendants have ever been willingly transparent or cooperate regarding disclosure of their product designs and operations. In this manner, all of these defendants have actively concealed such harm.

168.    Defendants also approve ads that contain harmful content and utilize private information of their minor users to precisely target them with content and recommendations,

assessing what will provoke a reaction, including encouragement of destructive and dangerous behaviors. Again, Meta and Snap specifically select and push this harmful content, for which they are then paid, and do so both for that direct profit and to increase user engagement, resulting in more profits down the road.[17]

169.    Meta and Snap utilize private information of their minor users to "precisely target [them] with content and recommendations, assessing what will provoke a reaction," including encouragement of "destructive and dangerous behaviors." Again, Defendants specifically select and push this harmful content, for which they are then paid, and do so both for that direct profit and also to increase user engagement, resulting in more profits down the road. "That's how [Defendants] can push teens into darker and darker places."[18] Defendants know that their products can push children "all the way from just something innocent like healthy recipes to anorexia promoting content over a very short period of time."[19] Defendants know that their products the content they are encouraging and helping to create is harmful to young users and choose "profits over safety"[20] any way.

170.    None of Plaintiff's claims rely on treating Defendants as the publisher or speaker of any third party's words or content. Plaintiff's claims seek to hold these Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for any good faith attempts on the part of these Defendants to restrict access to objectionable content.

171.    Plaintiff is not alleging that Defendants are liable for what the third parties said, but for what Defendants did.

172.    None of Plaintiff's Claims for Relief set forth herein treat Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiff seeks to hold

---

[17] *See, e.g.*, https://www.rev.com/blog/transcripts/facebook-whistleblower-frances-haugen-testifies-on-children-social-media-use-full-senate-hearing-transcript ("October 5, 2021, Senate Hearing Transcript").
[18] *Id.*
[19] October 5, 2021, Senate Hearing Transcript, Ms. Francis Haugen at 00:37:34.
[20] *Id.* at 02:47:07.

Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from anticipate use of their products. Defendants could manifestly fulfill their legal duty to design a reasonably safe social product and furnish adequate warnings of foreseeable dangers arising out of the use of their products without altering, deleting, or modifying the content of a single third- party post or communication. Some examples include,

    a. Not using their addictive and inherently dangerous algorithm and similar technologies in connection with any account held by a user under the age of 18.

    b. Not permitting any targeted advertisements to any user under the age of 18.

    c. Prioritizing internally their removal of harmful content (content their systems are promoting and amplifying) over the risk of losing some user engagement.

    d. Requiring identification upon opening of a new account, requiring parental consent for users under the age of 18 (which Snap currently claims to do but do not actually enforce in any way), and restricting users under the age of 18 to a single account.

    e. Requiring verification by email and phone number when a user opens a new account. Not requiring verification allows underage users to access these social media products and does not stop bad actors.

    f. Immediate suspension of accounts where Defendants have reason to know that the user is under the age of 13, including when the user declares that they are under the age of 13 in their bio or comments or chats and/or messages with any third party and where Defendants can determine an "estimated" age of under 13 based on other information they collect and/or have in their possession (including, for example, posted videos that clearly feature children under 13); and not allowing the account to resume until the user provides proof of age and identity and/or parental consent.

g.  Suspension of accounts and, in some cases, user bans, where Defendants have reason to know that the user is over the age of 18, but where they are providing information to suggest that they are minors and/or are representing themselves as minors to other users; and not allowing the account to resume until the user provides proof of age and identity.

h.  Removing social comparison features and/or hiding those features to reduce their harmful impact on teen users.

i.  Instituting advertising safeguards to ensure that Defendants are not profiting directly from or otherwise pushing or endorsing harmful ads, and removing advertising targeting tools so that advertisers cannot harm vulnerable user groups by aiming harmful advertisements at them.

j.  Requiring that all teen user accounts be set to private and not allowing any user under the age of 18 to change user settings to public.

k.  Removing all friend and group and content recommendation systems that involve teen users in any way (so, not recommending to teen users, but also, not recommending teen users to adults) and not permitting direct messaging, snaps, or other forms of direct communication with any user under the age of 18 not already hon the other user's friend list.

173.    These are just some examples, all of which could be accomplished easily and/or at commercially reasonable cost. Defendants know that they can make these change and, in many cases, have discussed these or similar changes internally. However, they have not instituted these types of safety features because they know that doing so would impact their astronomical revenue.

## V.   PLAINTIFF SPECIFIC ALLEGATIONS

A.   **I.J.E.'s Death Was Proximately Caused By Meta and Snap's Social Media Products**



174.   I.J.E. was born on November 21, 2006, and grew up in New Port Richey and Palm Harbor, Florida.

175.   He was a smart child, always earning honors in school, and wanted to be a psychologist when he grew up. He was also athletic and participated in competitive swimming in high school, with dreams of going to college on a swimming scholarship.

176.    I.J.E. began using social media sometime in middle school, which accounts he opened without his mother's knowledge or consent. When his mother Jennifer Mitchell learned that he had an Instagram account, however, she was not overly concerned as she had a Facebook account herself and understood based on Meta's representations to the public that these were safe platform aimed and designed for teenagers to use.

177.    Jennifer also eventually found out about I.J.E.'s Snapchat account, and understood based on what I.J.E. told her, the Snapchat marking she saw, and her observation of other kids I.J.E.'s age using Snapchat that this also was a relatively safe social media product. In fact, it appeared to be one marketed primarily to teens and children.

178.    In fact, Defendants designed Instagram and Snapchat to frustrate and prevent parents like Jennifer from exercising their rights and duties as parents to monitor and limit their child's use of their social media products. Jennifer was not aware when I.J.E.'s social media usage started, nor did she ultimately know which products he used or how many accounts he opened without her knowledge or consent. On information and belief, I.J.E. was under the age of 13 when he opened his first Instagram and/or Snapchat account, and also opened multiple accounts, the usernames for which he did not provide to his parents.

179.    Throughout the period of I.J.E.'s social media use, Jennifer was also unaware of the clinically addictive and mentally harmful effects of Instagram and Snapchat. Again, she understood from advertisements and reputation that these products were relatively safe and commonly used by children. They were even marketed to children.

180.    Defendants knowingly designed Instagram and Snapchat to enable minor users such as I.J.E. to use, become addicted to, and abuse their products without the knowledge or consent of their parents. Snapchat's Snap Streaks product feature has been referred to as one of the addictive across all social media platforms, particularly when it comes to teens. Snap has been urged to remove that product feature for years, for the health

and safety of children, and has refused.[21]

181.    Defendants designed Instagram and Snapchat to be attractive nuisances to young users such as I.J.E. but failed to exercise ordinary care owed to underage business invitees to prevent the recommendation, promotion, and amplification of dangerous and harmful content.

182.    I.J.E.'s social media use also coincided with a gradual decline in his mental health. I.J.E. became addicted to Instagram and Snapchat and spent increasing amounts of time communicating on social media, and engaged in the video, games, and reward features of Defendants' social media products.

183.    I.J.E. also began staying up late at night, or getting up after his mom went to bed, to access his social media accounts – Instagram and Snapchat. This was the result of his addiction to these social media products, which is an indicator of problematic usage of which Defendants are aware. That is, Defendants know that teen users are dependent on their products and are accessing them late at night and often, to the point of serious and harmful sleep deprivation. This began happening with I.J.E., resulting in anxiety, depression, anger, and outbursts, which his parents chalked up to normal teen behavior since they had no knowledge or reason to know of his growing and problematic addiction to the Instagram and Snapchat products.

184.    On the occasion when Jennifer Mitchell would ask I.J.E. to spend less time on his cell phone or try to restrict access, such efforts at exercising her parental rights and authority caused severe reactions in I.J.E..  Because of I.J.E.'s social media addiction, he would panic without access and would become angry or sullen and depressed. I.J.E. began spending less and less time with his friends, and more time glued to his phone, like millions of other American teens who are now dependent on Defendants' products.

---

[21] *See, e.g.,* https://www.bbc.com/news/technology-47623626 (Snapchat under scrutiny from MPs over "addictive" streaks), March 19, 2019.



185.    Meta and Snapchat began recommending and directing I.J.E. to connections, groups, and content that were harmful and inappropriate for a child of his age. Defendants' system led I.J.E. down a "rabbit hole" of dangerous content, including adult users who told I.J.E. about and encouraged him to investigate the Dark Web – an online location known for hosting criminal actors and illegal subject matters.

186.    On information and belief, Defendants' recommended content included videos, content, and groups glorifying danger and self-harm, including but not limited to things like the deadly game of Russian Roulette—which Defendants glorified and amplified

by repeatedly exposing I.J.E. to such content and by pushing, promoting, and sharing such content, which foreseeably led I.J.E. to come to believe that he could become social media famous if he created and posted similar dangerous content.

187.    I.J.E. used Snapchat's My Eyes Only Feature and other of Defendants' features and tools, including his ability to open multiple accounts and/or block access from his parents, to hide what was happening because of Defendants' social media products.

188.    Upon information and belief, Defendants connected I.J.E. to other users who then tried to sell him drugs, harassed or bullied him, and encouraged him to engage in self-harm. There are several individuals to whom I.J.E. would not have been exposed but for Defendants' recommendations system.

189.    Meta and Snapchat sent I.J.E. push notifications, reminders, emails, and/or other content designed to and that did worsen his addiction to their products.

190.    All the achievements and Trophies in Snapchat are unknown to users, and you don't even know about the achievement until you unlock it. This means that Snap's teen users do not know what will unlock an achievement, so they try new and extreme measures to do so. In this way, Snapchat is designed to operate like a slot machine,[22] and that design was effective on I.J.E. – prompting him engage in progressively more dangerous behavior to gain recognition on the Snap social media product. Worded otherwise, these products incentivize teens, by design, to do things they know to not be safe, but they do it anyway and for the sake of the picture or video. They do it for the "likes."

191.    I.J.E. wanted rewards, views, likes, and recognition and – like millions of other teenage social media users –he was willing to engage in extreme behavior to get them.

192.    Jennifer had no way of knowing what Defendants' social media products were doing to her only child while, in sharp contrast, Meta and Snap knew or should have known that they were causing this harm to I.J.E., including based on his age, usage information,

---

[22] *See* https://www.vice.com/en/article/vv5jkb/the-secret-ways-social-media-is-built-for-addiction (discussing intermittent reward systems similar to the Snap features, but in the context of Meta distributed features).

usage patterns—which both Defendants collect and, on information and belief, closely track—and content to which both Defendants were repeatedly exposing him via unsolicited methods, such as push notifications and algorithmically driven recommendation systems.

193.     But for Meta and Snap misrepresenting and/or concealing the true nature and safety of their social media products, I.J.E. would not have been exposed to the features and designs of their respective social media products.

194.     But for Meta and Snap's failure to verify age, identify, and parental consent of their minor users, I.J.E. would not have been exposed to the features and designs of their respective social media products.  I.J.E. would not have been able to open his first accounts and Jennifer Mitchell would have had a means to both identify the number of accounts he had and restrict access as she deemed appropriate.

195.     But for certain product features (to name only a few examples, like, follow, and views features common to both products), I.J.E. would not have experienced the anxiety and depression that stem from harmful social comparison.

196.     But for Meta and Snap's recommendation and ranking systems, I.J.E. would not have been targeted and overwhelmed by violent, sexual, and other harmful content, which harmful content Defendants promoted and amplified by design.

197.     But for the recommendation, public profile, and direct messaging settings designed, implemented, and utilized by Meta and Snap, I.J.E. would not have been exposed to strangers who utilize Defendants' platforms and related settings to bully, harass, and encourage minors to engage in self-harm and inherently dangerous acts – that is, the degree of harm caused by certain events is amplified exponentially by Defendants' products designs, additive characteristics, and available or default settings.

198.     On August 12, 2019, Jennifer Mitchell was getting ready for a two-week business trip. I.J.E. was dog sitting and had swimming class at the YMCA later that day, so he left early to drop the dog at his dad's house then he had swimming class. I.J.E. planned to head back to his dad's house after swimming, which is where he lived half of the time.

52

199.    That was the last time Jennifer saw or spoke with I.J.E.

200.    I.J.E.'s father was also travelling but would be returning on August 13, so I.J.E. was only going to be alone for one day. He had been left alone for a day before, and his parents had no reason to think that this would be a problem.

201.    After he left Jennifer's house, I.J.E. dropped off the dog, went to swim class, texted his dad, stopped at the store for fruit loops and sunflower seeds, retuned back to his dad's house and video chatted with his dad for a few minutes on Wazzap. Everything appeared normal. I.J.E. was laying his bed with the dog and did not appear agitated or upset in any way.

202.    That was the last time I.J.E.'s father saw or spoke with him.

203.    The next morning (August 13) Jennifer texted I.J.E. but did not hear back, so she texted his father during her layover in Minnesota. His father was also travelling at that time so did not get her text until he landed in Miami, Florida sometime later. It was around 5:30 p.m. at that point, and I.J.E.'s father noticed from an app on his phone that no one had come or gone in the last twenty-four hours – since I.J.E. returned home the day before – which was unusual. I.J.E.'s father had to retrieve his vehicle then headed home, which was a several hour drive. When he arrived home he found I.J.E. in his bedroom, and a large amount of dried blood and immediately knew that I.J.E. was dead.

204.    When the police arrived, they found I.J.E. with an iPhone that had run out of batteries, "an empty box of granola bars, empty black revolver holster and a .38 caliber round."

The north bedroom where the body was discovered was identified as the the bed was a sheets were in disarray and tangled, consistent with someone having slept in it. On the side of IPhone which appeared dead. There were also glasses, an empty box of granola bars, empty round. Under the pillow, two additional .38 caliber rounds were located. Another single .38 cali next to Ian's feet

A Publix receipt was located on the kitchen floor next to the trash can. It indicated it was from 08/12/2019 at 1729 hours. Two boxes of fruit loops and two boxes of sunflower seeds were unopened and located on top of the refrigerator.

a pillow and a blanket. The d, closest to the body, was an rovolver holster and a .38 calibe und was observed on the floor

cated at 36301 East Lake Rd ed. The fruit loop boxes ed in Ian's room

205.    I.J.E.'s father could not make sense of what had happened.

53

Edgar was extremely emotional and crying throughout our conversation. His thoughts were random and it was difficult keeping him focused to obtain details. Edgar observed it appeared Ian shot himself in the head. I discussed with Edgar if Ian ever showed signs of being suicidal or if he was upset about anything specific. Edgar began saying "no, no, no" and said "it must have been an accident, could it be an accident?" I advised Edgar I could not provide an answer as to I had no evidence of it at this time. We began to discuss possible situations for both scenarios.

Edgar advised Ian has never made any suicidal comments and has never showed any signs of depression. He mentioned Ian had a difficult time when he and Jennifer divorced approximately eight years ago. Ian had a very close relationship with Edgar and Jennifer and was the only child in the family.

206.    Neither could Jennifer. She received the phone call about her son's death when she landed in Alaska, and the airline flew her back to Florida immediately.

207.    I.J.E. was only 16 when he died.

208.    What Plaintiff knows now is that some time after his video chat with his father on the evening of August 12, 2019, I.J.E. began taking and uploading videos to Snapchat. In the three videos he posted, each only :08 to :10 seconds long, I.J.E. is holding a revolver containing a single bullet. He takes the revolver, spins the barrel, puts it to his head, and pulls the trigger. I.J.E. was playing Russian Roulette so that he could post videos of it on Snapchat, and Plaintiff believes that his camera was on the entire time. As of the date Plaintiff obtained access to I.J.E.'s Snapchat, these videos were still posted on his account.



Case 4:22-cv-06387-YGR   Document 1   Filed 08/04/22   Page 55 of 73

In one of the three videos, I.J.E. tells the intended Snapchat audience: "Okay I just chambered that to where if I pulled the trigger I'd die."

209.    Pinnellas County Sheriffs did not have the passcode for I.J.E.'s iPhone and tried unsuccessfully to open it such that Jennifer ended up locked out of the device. She asked Apple for his passcode and was told they would only open it with a Court Order, which she could not get because the police had ruled his death a suicide. Plaintiff is currently trying to obtain access to I.J.E.'s iPhone, the one found next to his body, and alleges on information and belief that there is one final video on that device – which also was intended for posting on Snapchat.

210.    These social media companies were not providing fun and safe photo sharing services, but rather, were dealing in incredibly addictive product features and pushing harmful algorithmically driven content, intended to keep I.J.E. hooked on their products by any means necessary. The truth was actively concealed by Defendants until 2021, when the Facebook whistleblower came forward and when Jennifer Mitchell watched the Netflix documentary Social Dilemma. That is when Jennifer realized what had happened to her son.



211.    There are many examples of why Meta and Snap do realize or should realize how their products are affecting teen users and are creating an unreasonable risk of harm.

212.    This includes but is not limited to the addictive design of Defendants' products, including internal Meta documents studying and admitting to the harmful and addictive impact of Instagram, particularly on young users, dated years before I.J.E.'s death. But also, Snap has been told for years that the "ephemeral nature" of its product is causing teen suicide. *See, for example,* https://protectyoungeyes.com/snapchat-suicide-social-media-killing-our-kids/.

213.   Meta and Snap have developed fundamentally dangerous product features, which also are entirely unnecessary to the communication aspects of their products. Making their products less addictive does not impact speech, nor does limiting the hours teens can use their product to reduce harms caused by sleep deprivation, nor does turning off their algorithms and recommendation systems in the case of minor users.

214.   The death of children because of social media is an epidemic, and it is an epidemic Defendants have known about for years. Nothing Defendants can do will ever bring I.J.E. back, but Defendants can and should be forced to stop letting other children die because of known and fixable defects within their social media products.

215.   Defendants not only failed to warn Jennifer Mitchell and I.J.E. of the dangers of addiction, sleep deprivation, sexual abuse, known mental harms, and problematic use of their applications, but affirmatively misrepresented the safety, utility, and addictive properties of their products to minor users and their parents, and I.J.E. is gone as a result. Jennifer Mitchell lost her only child, while Meta and Snapchat profited handsomely from I.J.E.'s addiction to their social media products and even from the views garnered by videos he posted just before the moment of his death.

## VI.   PLAINTIFF'S CLAIMS

## COUNT I - STRICT PRODUCT LIABILITY (Design Defect)

216.   Plaintiff realleges each and every allegation contained in paragraphs 1 through 216 as if fully stated herein.

217.   Under Restatement (Second) of Torts § 402(a) and Florida law, one who sells any product in a defective condition unreasonably dangerous to the user is subject to liability for physical harm thereby caused to the user if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition which it was sold.

218.   Defendants' products are defective because the foreseeable risks of harm posed by the product's design could have been reduced or avoided by the adoption of a

reasonable alternative design by Defendants and the omission of the alternative design renders the product not reasonably safe. These defective conditions rendered these products unreasonably dangerous to persons or property and existed at the time the product left Defendants' control, reached the user or consumer without substantial change in the condition and its defective condition was a cause of Plaintiff's injury.

219.   Defendants designed, manufactured, marketed, and sold social media products that were unreasonably dangerous because they were designed to be addictive to the minor users to whom Defendants actively marketed and because the foreseeable use of Defendants' products causes mental and physical harm to minor users.

220.   Defendants' products were unreasonably dangerous because they contained numerous design characteristics that are not necessary for the utility provided to the user but are unreasonably dangerous and implemented by Defendants solely to increase the profits they derived from each additional user and the length of time they could keep each user dependent on their product.

A.   **Inadequate Safeguards From Harmful Content**

221.   Instagram and Snapchat are defectively designed.

222.   As designed, Snapchat and Instagram algorithms and other product features are not reasonably safe because they affirmatively direct minor users to harmful content while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible to design an algorithm and technologies that substantially distinguish between harmful and innocuous content and protect minor users from being exposed to harmful content without altering, modifying, or deleting any third-party content posted on Defendants' social media products. The cost of designing these products to incorporate this safeguard would be negligible while benefit would be high in terms of reducing the quantum of mental and physical harm sustained by minor users and their families.

223.   As designed, Instagram and Snapchat algorithms and other product features are not reasonably safe because they affirmatively direct and recommend minor users to

harmful groups and other users, while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible to design an algorithm and technologies that do not make harmful connection recommendations to minor users, or any connection recommendations at all; it is feasible to design and algorithm and technologies that do not recommend harmful groups to minor users, or any group recommendations at all; and it is feasible to restrict access to minor users by strangers and adult users via direct messaging, to restrict and limit such access to users already on a minor user's "friend" list, or to prevent such access altogether. Defendants know that these product features cause a significant number of harms to their minor users, such as bullying and encouragement of self-harm, personal injury, and wrongful death – all of which are at issue in this case.

224.    Defendants also engage in conduct, outside of the algorithms and related technologies themselves, that is designed to promote harmful content as a means of increasing their revenue from advertisements. This includes but is not limited to efforts to encourage advertisers to design ads that appeal to minors, including children and teens; and product design features intended to attract and engage minor users to these virtual spaces where harmful ad content is then pushed to those users in a manner intended to increase user engagement, thereby increasing revenue to Defendants at the direct cost of user wellbeing.

225.    Reasonable users (and their parents) would not expect that Defendants' products would knowingly expose them to such harmful content and/or that Defendants' products would direct them to harmful content at all, much less in the manipulative and coercive manner that they do. Defendants have and continue to knowingly use their algorithms and other technologies on users in a manner designed to affirmatively change their behavior, which methods are particularly effective on (and harmful to) Defendants' youngest users.

B.      **Failure to Verify Minor Users' Age and Identity**

226.    Instagram and Snapchat are defectively designed

227.    As designed, Defendants' products are not reasonably safe because they do

not provide for adequate age verification by requiring users to document and verify their age and identity.

228.   Minor users whose parents have taken affirmative steps to keep them away from Defendants' products often open multiple accounts, such that Defendants know or have reason to know that the user is underage and/or does not have parental permission to use their product. Defendants already have the information and means they need to ascertain with reasonable certainty their users' actual age. Defendants utilize these tools to investigate, assess, and report on percentages and totals of underage users for internal assessment purposes. They then choose to simply do nothing about that information as it relates to the specific, underaged users themselves.

229.   Reasonably accurate age and identity verification is not only feasible but widely deployed by online retailers and internet service providers. Defendants not only have the ability to estimate the age of their users, but actually do so.

230.   The cost of incorporating age and identify verification into Defendants' products would be negligible, whereas the benefit of age and identity verification would be a substantial reduction in severe mental health harms and abuse among minor users of Defendants' products.

## C.   Inadequate Parental Control and Monitoring

231.   Instagram and Snapchat are defectively designed

232.   Defendants have intentionally designed products to frustrate the exercise of parental responsibility by their minor users' parents. Parents have a right to monitor their children's social media activity to protect them from harm. Defendants have designed products that make it difficult, if not impossible, for parents to exercise parental responsibility.

233.   Defendants' products are also defective for lack of parental controls, permission, and monitoring capability available on many other devices and applications.

234.   Defendants' products are designed with specific product features intended to

prevent and/or interfere with parents' reasonable and lawful exercise of parental control, permission, and monitoring capability available on many other devices and applications.

**D.    Intentional Direction of Minor Users to Harmful Content**

235.    Instagram and Snapchat are defectively designed.

236.    Default "recommendations" communicated to new teenage users, including I.J.E., purposefully steered him toward content Defendants knew to be harmful to children of his age and gender.

237.    Advertising content pushed to new minor users, including I.J.E., because of their age and vulnerability, purposefully steer those users toward content Defendants know to be harmful to children of their age and gender.

**E.    Design of Addictive Social Media Products**

238.    Instagram and Snapchat are defectively designed.

239.    As designed, Defendants' social media products are addictive to minor users as follows: When minors use design features such as "likes" or "streaks" it causes their brains to release dopamine, which creates short term euphoria. However, as soon as dopamine is released, minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated and their euphoria is countered by dejection. In normal stimulatory environments, this dejection abates, and neutrality is restored. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria. As this pattern continues over a period of months and the neurological baseline to trigger minor users' dopamine responses increases, they continue to use Instagram, not for enjoyment, but simply to feel normal. Once they stop using Instagram, minor users experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

240.    Addiction is not restricted to a substance abuse disorders. Rather, the working definition of addiction promulgated in the seminal article *Addictive behaviors:*

*Etiology and Treatment* published by the American Psychological Association in its 1988 *Annual Review of Psychology* defines addiction as,

> a repetitive habit pattern that increases the risk of disease and/or associated personal and social problems. Addictive behaviors are often experienced subjectively as 'loss of control' – the behavior contrives to occur despite volitional attempts to abstain or moderate use. These habit patterns are typically characterized by immediate gratification (short term reward), often coupled with delayed deleterious effects (long term costs). Attempts to change an addictive behavior (via treatment or self-initiation) are typically marked with high relapse rates.

241.    Addiction researchers agree that addiction involves six core components: (1) salience—the activity dominates thinking and behavior; (2) mood modification—the activity modifies/improves mood; (3) tolerance—increasing amounts of the activity are required to achieve previous effects; (4) withdrawal—the occurrence of unpleasant feelings when the activity is discontinued or suddenly reduced; (5) conflict—the activity causes conflicts in relationships, in work/education, and other activities; and (6) relapse—a tendency to revert to earlier patterns of the activity after abstinence or control.

242.    Social media addiction has emerged as a problem of global concern, with researchers all over the world conducting studies to evaluate how pervasive the problem is. Addictive social media use is manifested when a user (1) becomes preoccupied by social media (salience); (2) uses social media in order to reduce negative feelings (mood modification); (3) gradually uses social media more and more in to get the same pleasure from it (tolerance/craving); (4) suffers distress if prohibited from using social media (withdrawal); (5) sacrifices other obligations and/ or cases harm to other important life areas because of their social media use (conflict/functional impairment); and (6) seeks to curtail their use of social media without success (relapse/loss of control).

243.    The Bergen Facebook Addiction Scale (BFAS) was specifically developed by psychologists in to assess subjects' social media use using the aforementioned addiction criteria, and is by far the most widely used measure of social media addiction. Originally designed for Facebook, BFAS has since been generalized to all social media. BFAS has

been translated into dozens of languages, including Chinese, and is used by researchers throughout the world to measure social media addiction.

244.   BFAS asks subjects to consider their social media usage with respect to the six following statements and answer either (1) very rarely, (2) rarely, (3) sometimes, (4) often, or (5) very often,

   a.  You spend a lot of time thinking about social media or planning how to use it.

   b.  You feel an urge to use social media more and more.

   c.  You use social media in order to forget about personal problems.

   d.  You have tried to cut down on the use of social media without success.

   e.  You become restless or troubled if you are prohibited from using social media.

   f.  You use social media so much that it has had a negative impact on your job/studies.

Subjects who score a "4" or "5" on at least 4 of those statements are deemed to suffer from social media addiction.

245.   Addictive use of social media by minors is psychologically and neurologically analogous to internet gaming disorder as described in the American Psychiatric Association's 2013 *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5), which is used by mental health professionals to diagnose mental disorders. Gaming addiction is a recognized mental health disorder by the World Health Organization and International Classification of Diseases and is functionally and psychologically equivalent to social media addition.

246.   The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming referenced in DSM 5 and include:

   a.  Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or not possible.

63

b.  Tolerance, the need to spend more time using social media to satisfy the urge.

c.  Inability to reduce social media usages, unsuccessful attempts to quit gaming.

d.  Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

e.  Continuing to use social media despite problems.

f.  Deceiving family members or others about the amount of time spent on social media.

g.  The use of social media to relieve negative moods, such as guilt or hopelessness; and

h.  Jeopardized school or work performance or relationships due to social media usage.

247.    Defendants' advertising profits are directly tied to the quantity of their users' online time and engagement, and their algorithms and other product features are designed to maximize the time users spend using the product by directing them to content that is progressively more and more stimulative. Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform. However, reasonable minor users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

248.    It is feasible to make Defendants' products not addictive to minor users by turning off the algorithms, limiting the frequency and duration of access, and suspending service during sleeping hours. Designing software that limits the frequency and duration of minor users' screen use and suspends service during sleeping hours could be accomplished at negligible cost; whereas the benefit of minor users maintaining healthy sleep patterns would be a significant reduction in depression, attempted and completed suicide, and other forms self-harm among this vulnerable age cohort.

**F.** **Inadequate Notification of Parents of Dangerous and Problematic Social Media Usage by Minor Users**

249. Instagram and Snapchat are defectively designed.

250. Defendants' products are not reasonably safe as designed because they do not include any safeguards to notify users and their parents of usage that Defendants knows to be problematic and likely to cause negative mental health effects to users, including excessive passive use and use disruptive of normal sleep patterns. This design is defective and unreasonable because:

251. It is reasonable for parents to expect that social media companies that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive or occurs during sleep time. It is feasible for Defendants to design a product that identifies a significant percentage of its minor users who are using the product more than three hours per day or using it during sleeping hours at negligible cost.

252. Defendants' products are not reasonably safe as designed because, despite numerous reported instances of bullying, abuse, suicide, and wrongful death of minors resulting from use of Defendants' social media products, Defendants have not undertaken reasonable design changes to protect underage users from these dangers, including notifying parents of underage users when Defendants have reason to know of harmful and potentially life-threatening uses of and/or exposure by their products.

253. Defendants' entire business is premised upon collecting and analyzing user data and it is feasible to use Defendants' data and algorithms and other technologies to identify situations of imminent harm to minors. Moreover, it is reasonable for parents to expect that platforms such as Instagram and Snapchat which actively promote their services to minors, will undertake reasonable efforts to identify users suffering from mental injury, self-harm, and sexual abuse and implement technological safeguards to notify parents by text, email, or other reasonable means that their child is in danger.

254. As a proximate result of these dangerous and defective design attributes of

Defendants' product, I.J.E. suffered severe mental harm, personal injury, and death. Plaintiff did not know, and in the exercise of reasonable diligence could not have known, of these defective design in Defendants' products until late 2021 at the earliest.

255.    As a result of these dangerous and defective design attributes of Meta and Snap's products, Plaintiff Jennifer Mitchell suffered emotional distress and pecuniary hardship due to her child's mental harm and death resulting from social media addiction.

256.    Defendants are further liable to Plaintiff for punitive damages based upon the willful and wanton design of their products that were intentionally marketed and sold to underage users, whom they knew would be seriously harmed through their use of Instagram and Snapchat.

### COUNT II – STRICT PRODUCT LIABILITY (Failure to Warn)

257.    Plaintiff realleges each and every allegation contained in paragraphs 1 through 257 as if fully stated herein.

258.    Defendants' products are defective because of inadequate instructions or warnings because the foreseeable risks of harm posed by these products could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe. This defective condition rendered the products unreasonably dangerous to persons or property, existed at the time the products left Defendants' control, reached the user or consumer without substantial change in the condition in which they were sold, and were a cause of Plaintiff's injuries.

259.    Defendants' products are unreasonably dangerous and defective because they contain no warning to users or parents regarding the addictive design and effects of Instagram and Snapchat.

260.    Defendants' social media product rely on highly complex and proprietary algorithms and similar technologies that are both undisclosed and unfathomable to ordinary consumers, who do not expect that social media platforms are physically and/or

psychologically addictive.

261.    The magnitude of harm from addiction to Defendants' product is horrific, ranging from simple diversion from academic, athletic, and face-to-face socialization to sleep loss, severe depression, anxiety, self-harm, and suicide or death.

262.    Meta and Snap had actual knowledge of the harms resulting from minors' addictive use of their social media platforms.

263.    Defendants' products are unreasonably dangerous because they lack any warnings that foreseeable product use can disrupt healthy sleep patterns or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours. Excessive screen time is harmful to adolescents' mental health and sleep patterns and emotional well-being. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

264.    It is feasible for Defendants' products to report the frequency and duration of their minor users' screen time to their parents without disclosing the content of communications at negligible cost, whereas parents' ability to track the frequency, time and duration of their minor child's social media use are better situated to identify and address problems arising from such use and to better exercise their rights and responsibilities as parents.

265.    Defendants knew about these harms, knew that users and parents would not be able to safely use their products without warnings, and failed to provide warnings that were adequate to make the product reasonably safe during ordinary and foreseeable use by children.

266.    As a result of Defendants' failure to warn, I.J.E. suffered severe mental harm, leading to physical injury and death from his use of Instagram and Snapchat.

267.    As a result of Defendants' failure to warn, Plaintiff Jennifer Mitchell suffered emotional distress and pecuniary hardship due to her child's mental harm and death resulting

from social media addiction.

268.    Defendants are further liable to Plaintiff for punitive damages based upon their willful and wanton failure to warn of known dangers of their products that were intentionally marketed and sold to teenage users, whom they knew would be seriously harmed through their use of Instagram and Snapchat.

## COUNT III – NEGLIGENCE

269.    Plaintiff realleges each and every allegation contained in paragraphs 1 through 269 as if fully stated herein.

270.    At all relevant times, Defendants had a duty to exercise reasonable care and caution for the safety of individuals using their products, such I.J.E.

271.    Defendants owe a heightened duty of care to minor users of their social media products because adolescents' brains are not fully developed, which results in a diminished capacity to make good decisions regarding their social media usages, eschew self-destructive behaviors, and overcome emotional and psychological harm from negative and destructive social media encounters.

272.    As product manufacturers marketing and selling products to consumers, Defendants owed a duty to exercise ordinary care in the manufacture, marketing, and sale of their products, including a duty to warn minor users and their parents of hazards that Defendants knew to be present, but not obvious, to underage users and their parents.

273.    As business owners, Defendants owe their users who visit their social media platforms and from whom they derive billions of dollars per year in advertising revenue a duty of ordinary care substantially similar to that owed by physical business owners to its business invitees.

274.    Defendants were negligent, grossly negligent, reckless and/or careless in that they failed to exercise ordinary care and caution for the safety of underage users, like I.J.E., using their social media products.

275.    Defendants were negligent in failing to conduct adequate testing and failing

to allow independent academic researchers to adequately study the effects of their products and levels of problematic use amongst teenage users. Defendants know that their products are harmful, cause extensive mental harm, and that minor users are engaging in problematic and addictive use that their parents are helpless to monitor and prevent.

276.    Defendants are negligent in failing to provide adequate warnings about the dangers associated with the use of social media products and in failing to advise users and their parents about how and when to safely use their social media platforms and features.

277.    Defendants are negligent in failing to fully assess, investigate, and restrict the use of their social media products by adults to abuse, manipulate, and exploit minor users of their social media products.

278.    Defendants are negligent in failing to provide users and parents the tools to ensure their social media products are used in a limited and safe manner by underage users.

279.    As a result of Defendants' negligence, I.J.E. suffered severe mental harm and personal injury from his use of Instagram and Snapchat.

280.    As a result of Defendants' negligence, Plaintiff Jennifer Mitchell suffered emotional distress and pecuniary hardship due to her child's mental harm and death resulting from social media addiction.

281.    Defendants are further liable to Plaintiff for punitive damages based upon its willful and wanton conduct toward underage users, including I.J.E., whom they knew would be seriously harmed through the use of their social media products.

## COUNT IV – VIOLATIONS OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

### (Fla. Stat. Ann. § 501.204, *et seq.*)

282.    Plaintiff realleges each and every allegation contained in paragraphs 1 through 282 as if fully stated herein.

283.    Defendants Meta and Snap advertised, solicited, provided, offered, and/or distributed goods or services to decedent I.J.E. in the State of Florida. In fact, Defendants

Meta and Snap advertise, solicit, provide, offer, and/or distribute goods or services to millions of Florida residents and businesses every day.

284.    Plaintiff Jennifer Mitchell and decedent I.J.E. are consumers as that term is defined in Florida's Deceptive and Unfair Trade Practices Act.

285.    Defendants' practices were unfair, unconscionable, and deceptive because:

a.  Defendants knew or should have known about the harms their products were causing but failed to disclose and stayed the course in a manner that made it impossible for ethical manufacturers to compete in the social media space.

b.  Defendants' convinced Florida consumers, including Plaintiff, that their products were safe when, in fact, Defendants knew that their products were not safe and that they posed a risk of addiction, depression, anxiety, anger, and other harms, including personal injury and death to a significant percentage of teenagers and children who used their products.

c.  Defendants' convinced Florida consumers, including Plaintiff, that their products were "free" when, in fact, Florida residents were the product and Defendants profited from their scheme and made millions each year from Florida residents alone.

d.  Defendants failed to implement safety protocols during the design process for their products and, once they identified product defects they refused to recall or stop distributing their products, despite knowledge that those products were causing harm to Florida consumers.

e.  Defendants designed their products to be deliberately addictive.

f.  Defendants were prohibited from distributing their services and products to children under the age of 13, yet marketed and targeted their products to children under 13 with the knowledge that those children would then flock to their social media platforms, moreover, the marketing Defendants aimed at children under the age of 13 only further served to lull parents into a false

sense of security that Defendants' products were not only safe, but were intended for use by those age groups.

    g.   Defendant Snap claimed that it does not distribute its services to children under the age of 18 and would not allow users to open more than one account, yet knowingly allowed users under the age of 18 to use its product and knowingly allowed users to open multiple accounts.

    h.   Defendants utilized inherently dangerous algorithms, the programming for which they concealed from public disclosure.

286.    Defendants' conduct is unlawful as set forth in Counts I-III, above.

287.    Defendants promoted their products to underage users, including I.J.E., while concealing critical information regarding the addictive nature and risk of harm these products pose. Defendants knew and should have known that their statements and omissions regarding the addictive and harmful nature of their products were misleading and therefore likely to deceive the members of the public who use Defendants' products and who permit their underage children to use Defendants' products. Had Plaintiff known of the dangerous nature of Defendants' products, she would have taken early and aggressive steps to stop or limit her child's use of Defendants' products, which is the precise reason why Defendants have gone to such lengths to hide the truth from millions of Florida consumers.

288.    Defendants' practices are unfair and violate the Deceptive and Unfair Trade Practices Act because they offend established public policy, and because the harm these practices cause to consumers greatly outweighs any benefits associated with them.

289.    Defendants' conduct has resulted in a substantial and actual physical and pecuniary injury that Plaintiff could not reasonably have avoided because of Defendants' deceptive conduct. This substantial harm is not outweighed by any countervailing benefits to consumers or competition.

290.    As a direct and proximate result of the foregoing acts and practices, Defendants have received, or will receive, income, profits, and other benefits, which they

would not have received if they had not engaged in the violations of the Deceptive and Unfair Trade Practices Act described herein. As a direct and proximate result of the foregoing acts and practices, Defendants have also obtained an unfair advantage over similar businesses that have not engaged in such practices.

291.    As a result of Defendants' Deceptive and Unfair Trade Practices Act violations, Plaintiff suffered an injury in fact and lost money as set forth above and detailed in her prayer for relief.

292.    Accordingly, Plaintiff seeks actual damages, declaratory judgement that Defendants' acts are in violation of the Deceptive and Unfair Trade Practices Act, and reasonable fees and costs incurred in connection with this claim.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants for relief as follows:

a) Past physical and mental pain and suffering of I.J.E., in an amount to be more readily ascertained at the time and place set for trial;

b) Loss of enjoyment of life, in an amount to be more readily ascertained at the time and place set for trial;

c) Past medical care expenses for the care and treatment of the injuries sustained by I.J.E., in an amount to be more readily ascertained at the time and place set for trial;

d) Past and future impairment to capacity to perform everyday activities;

e) Plaintiff's pecuniary loss and loss of I.J.E.'s services, comfort, care, society, and companionship to Jennifer Mitchell;

f) Loss of future income and earning capacity of I.J.E.;

g) Punitive damages;

h) Injunctive relief, including, but not limited to, ordering Defendants to stop the harmful conduct alleged herein, remedy the unreasonably dangerous algorithms in

their social media products, and provide warnings to minor users and their parents that Defendants' social media products are addictive and pose a clear and present danger to unsuspecting minors;

i) Reasonable costs and attorney and expert/consultant fees incurred in prosecuting this action; and

j) Such other and further relief as this Court deems just and equitable.

DATED: August 4, 2022.

SOCIAL MEDIA VICTIMS LAW CENTER PLLC

By: _____
        Matthew Bergman

Matthew Bergman
matt@socialmediavictims.org
Laura Marquez-Garrett
laura@socialmediavictims.org
Glenn Draper
glenn@socialmediavictims.org
821 Second Avenue, Suite 2100
Seattle, WA 98104
Telephone: (206) 741-4862
Facsimile: (206) 957-9549

SEEGER WEISS LLP

Christopher A. Seeger
cseeger@seegerweiss.com
Christopher Ayers
cayers@seegerweiss.com
55 Challenger Road
Ridgefield Park, NJ 07660
Telephone: 973-639-9100
Facsimile: 973-679-8656

Robert H. Klonoff
klonoff@usa.net
2425 S.W. 76th Ave.
Portland, Oregon 97225
Telephone: (503) 702-0218
Facsimile: (503) 768-6671

Attorneys for Plaintiff